[No. 41640.    En Banc.    August 8, 1974.]

LEONARD TONASKET, *Appellant*, v. THE STATE OF WASHINGTON
et al., *Respondents.*

*Ziontz, Pirtle, Morisset & Ernstoff,* by *Robert L. Pirtle,*
for appellant.

*Slade Gorton, Attorney General, Timothy R. Malone,
Senior Assistant,* and *William D. Dexter, Assistant,* for re-
spondents.

HAMILTON, J.—Leonard Tonasket appealed our decision in *Tonasket v. State,* 79 Wn.2d 607, 488 P.2d 281 (1971), to the United States Supreme Court. The court noted probable jurisdiction and following submission of the case vacated this court's judgment and remanded the cause for reconsideration. The per curiam order of remand, dated April 24, 1973, reads as follows:

The judgment of the Supreme Court of Washington is vacated, and the case is remanded to that Court for reconsideration in light of §§ 6 and 7 of c. 157, 1972 Extraordinary Session Laws of the State of Washington, and this Court's decision in *McClanahan* v. *Arizona State Tax Comm'n, ante,* p. 164 [411 U.S. 164, 36 L. Ed. 2d 129, 93 S. Ct. 1257 (1973)].

*Tonasket v. Washington,* 411 U.S. 451, 36 L. Ed. 2d 385, 93 S. Ct. 1941 (1973).

We perceive three questions arising out of the remand. (1) Has the State of Washington validly assumed civil and criminal jurisdiction over the Colville Indian Reservation pursuant to Public Law 83-280, ch. 505, 67 Stat. 588? (2) Does Public Law 83-280 grant the State of Washington authority to extend its civil excise tax laws to Indian retailers, who serve non-Indian consumers, within the exterior boundaries of an Indian reservation? (3) Do Laws of 1972, 1st Ex. Sess., ch. 157, §§ 6 and 7, exempt Indian retailers from collection of the state cigarette excise tax?

Before undertaking to resolve these questions, we deem it appropriate to briefly outline the background facts upon which our current conclusions must rest.

The Colville Confederated Tribes consist of 11 separate Indian tribes placed upon the Colville Indian Reservation in 1872.[1] The confederacy is recognized by the Bureau of

---

[1]The reservation was established and the tribes placed therein by an Executive Order of President Ulysses S. Grant. Executive Order of April 9, 1872, *as amended by* Executive Order of July 2, 1872, 1 C.J. Kappler, *Indian Affairs, Laws & Treaties* 915-16 (1902). (Hereinafter cited as C.J. Kappler.)

Indian Affairs and is governed by a tribal business council pursuant to a constitution and bylaws adopted and officially approved in 1938.

In January of 1965, the Colville Business Council issued Resolution 1965-4 requesting that the State of Washington assume criminal and civil jurisdiction over the Colville tribes and reservation as permitted under Public Law 83-280. Pursuant to RCW 37.12.021, Governor Daniel J. Evans issued a proclamation assuming, on behalf of the State, the requested jurisdiction, which the State has since exercised.[2]

The original reservation which encompassed large parts of Eastern Washington was opened to settlement and the tribes resident therein were moved to a somewhat smaller area of land (1.3 million acres today) under the Act of July 1, 1892, 27 Stat. 62. While there does not appear to be any existent treaty establishing the rights of these Indians, a close reading of this act would appear to set by statute the normal treaty rights and responsibilities. See 1 C.J. Kappler §§ 2, 4-6, and 8, at pages 441-43. The mineral-land laws of the United States were extended to the Colville Reservation in the Act of February 20, 1896, 29 Stat. 9, 1 C.J. Kappler at page 570, and timber rights of entry were established under the general Indian Department Appropriations Act of July 1, 1898, 30 Stat. 571, 593, 1 C.J. Kappler at page 667. The above-referred-to portion of the Colville Reservation, subject to the mineral-land laws and timber rights, was officially proclaimed open to settlement under President William McKinley's Proclamation of April 10, 1900, 31 Stat. 1963, 1 C.J. Kappler at page 1000-02 (effective on October 10, 1900).

A 1906 Act of Congress, 34 Stat. 80, provided for the sale of mineral lands and for the settlement and entry under the homestead laws of other surplus lands remaining on the diminished Colville Reservation after allotments were first made of 80 acres of land to all members of the Colville Indian Tribe. In 1916, a Presidential Proclamation, 39 Stat. 1778, was issued pursuant to this act and prescribed the method for disposal of surplus lands under the homestead laws the 1906 Act had authorized. In Seymour v. Superintendent of Wash. State Penitentiary, 368 U.S. 351, 359, 7 L. Ed. 2d 346, 82 S. Ct. 424 (1962), the Supreme Court held that this act and the resulting proclamation were intended by Congress to preserve and continue the existence of the Colville Reservation. The court was unable to find any enactment where Congress had taken away from the Colville Indians any part of the land within the boundaries of the area which had been recognized as the reservation since 1892, and as such the reservation remains today.

[2]At the date of this opinion, 10 tribes out of 22 to 24 tribes residing in the state of Washington have so elected to come under the provision of our law. (Figures received from the Bureau of Indian Affairs as of

Leonard Tonasket is a full-blooded enrolled member of the confederated tribes residing upon the reservation. He is, in fact, a direct descendant of Chief Tonasket of the Okanogan band, one of the original 11 tribes constituting the confederacy. Some time prior to 1967, Mr. Tonasket, with official approval, borrowed moneys from the tribal loan office which he utilized to construct and stock a retail store situated within the boundaries of the reservation upon allotted trust lands held in his name. The principal retail commodity was cigarettes which were sold indiscriminately to Indians and non-Indians. Conceiving that federal Indian trader statutes, 25 U.S.C. §§ 261-64 (1970), did not require licensing of full-blooded Indian traders upon Indian reservations, none was then issued to Mr. Tonasket by the Bureau of Indian Affairs. Furthermore, Mr. Tonasket did not seek or obtain the license required under RCW 19.91.120,[3] register as a retailer pursuant to RCW 82.32.030,[4]

---

early March 1972.) The names of the tribes and the effective dates of state jurisdiction are as follows:

| Tribe | Date of State Jurisdiction |
|---|---|
| Skokomish | September 28, 1957 |
| Muckleshoot | October 25, 1957 |
| Quileute | December 2, 1957 |
| Chehalis | December 13, 1957 |
| Nisqually | January 1, 1958 |
| Tulalip | July 7, 1958 |
| Quinaielt (Quinault) | July 14, 1958 |
| Squaxin Island | September 25, 1959 |
| Swinomish | June 7, 1963 (criminal only) |
| Colville | January 29, 1965 |

It should be noted that these dates are a matter of public record in the office of the Governor. The Suquamish tribe did vote to come under state jurisdiction effective July 14, 1958; however, the tribe later revoked the jurisdiction, with the Governor's approval, effective August 26, 1971. The Quinault tribe also revoked its jurisdiction effective January 12, 1965; however, it later requested reinstatement and Governor Evans so reinstated its jurisdiction effective August 15, 1968.

[3] "After June 12, 1957, no person shall engage in, or conduct the business of purchasing, selling, consigning, or distributing cigarettes in this state, without having first obtained the appropriate license for that purpose as prescribed in RCW 19.91.130." RCW 19.91.120.

[4] "If any person engages in any business or performs any act upon which a tax is imposed by the preceding chapters, he shall, whether

or affix tax stamps to cigarettes in his possession and being sold as prescribed by RCW 82.24.050.[5]

In February of 1967, representatives of the State Tax

---

taxable or not, under such rules and regulations as the commission shall prescribe, apply for and obtain from the commission, upon payment of a fee of one dollar, a registration certificate. Such registration certificate shall be personal and nontransferable and shall be valid as long as the taxpayer continues in business and pays the tax accrued to the state. In case business is transacted at two or more separate places by one taxpayer, a separate registration certificate for each place at which business is transacted with the public shall be required, but, for such additional certificates no fee shall be required. Each certificate shall be numbered and shall show the name, residence, and place and character of business of the taxpayer and such other information as the tax commission deems necessary and shall be posted in a conspicuous place at the place of business for which it is issued. Where a place of business of the taxpayer is changed, the taxpayer must return to the commission the existing certificate, and a new certificate will be issued for the new place of business free of charge. No person shall engage in any business taxable hereunder without being registered in compliance with the provisions of this section, except that the commission, by general regulation, may provide for the issuance of certificates of registration to temporary places of business without requiring the payment of any fee." RCW 82.32.030.

[5]"Every retailer shall, except as to those articles on which the tax has been paid by the proper affixing of stamps by a wholesaler, as herein provided, affix the stamps for the denomination and amount necessary to represent the tax on each individual package or container, the same to be done, in all cases, immediately upon receipt by the retailer of the unstamped articles: *Provided,* That any retailer engaged in interstate business, who furnishes surety bond in a sum satisfactory to the commission, shall be permitted to set aside such part of his stock as may be necessary for the conduct of such interstate business without affixing the stamps required by this chapter. Such interstate stock shall be kept separate and apart from stamped stock: *Provided further,* That every retailer shall, at the time of shipping or delivering any of the articles taxed herein to a point outside of this state, make a true duplicate invoice of the same which shall show full and complete details of the interstate sale or delivery, and shall transmit said true duplicate invoice to the main office of the commission, at Olympia, not later than the fifteenth day of the following calendar month, and for failure to comply with the requirements of this proviso the commission may revoke the permission granted to the taxpayer to maintain an interstate stock of goods to which the stamps required by this chapter have not been affixed." Laws of 1961, ch. 15, § 82.24.050, p. 971. (It should be noted that this section has been amended by the Laws of 1969, 1st Ex. Sess., ch. 214, § 2, p. 1617.)

Commission entered Mr. Tonasket's store and seized approximately 800 cartons of unstamped cigarettes then in stock. He was placed under arrest and charged by information with violations of the cited statutes. Violations in each instance carry criminal penalties.

Mr. Tonasket then initiated this action seeking declaratory relief to the end that he, as a full-blooded enrolled Indian doing business on allotted trust lands within the boundaries of the Colville Reservation, was free of the state revenue laws relating to retail sales of cigarettes and other commodities. He further prayed that State Tax Commission officials be enjoined from seeking to enforce such tax requirements.

Relief was denied in the Superior Court, and the action was ordered dismissed.

On appeal we affirmed the trial court, holding that state assumption of civil and criminal jurisdiction over an Indian tribe pursuant to Public Law 83-280 conferred upon the state regulatory powers over merchandising activities of Indians upon their reservations in the same fashion as pertains to merchandising activities of off-reservation citizens. We reasoned that the burdens as well as the benefits of state laws became applicable under the federal statute, including the licensing and registration of cigarette retailers, and the requirement that tax stamps be affixed pursuant to our statutory scheme. *Tonasket v. State,* 79 Wn.2d 607, 488 P.2d 281 (1971). Since our decision and prior, as well as subsequent, to the remand by the United States Supreme Court, several events have occurred of which we take note.

On February 19, 1972, effective February 27, 1972, the legislature enacted Laws of 1972, 1st Ex. Sess., ch. 157. Sections 6 and 7 of that enactment constituted additions to RCW 82.24, the cigarette tax statute. Codified as RCW 82.24.250 and .260 respectively, the new sections provide:

> Every person who shall transport cigarettes not having the stamps affixed to the packages or containers, upon the public highways, roads or streets of this state shall have in his actual possession invoices or delivery tickets

for such cigarettes, which shall show the true name and address of the consignor or seller, the true name of the consignee or purchaser, and the quantity and brands of the cigarettes so transported. If the cigarettes are consigned to or purchased by any person in this state such purchaser or consignee must be a person who is authorized by chapter 82.24 RCW to possess unstamped cigarettes in this state. In the absence of such invoices or delivery tickets, or, if the name or address of the consignee or purchaser is falsified or if the purchaser or consignee is not authorized by chapter 82.24 RCW to possess unstamped cigarettes, the cigarettes so transported shall be deemed contraband subject to seizure and sale under the provisions of RCW 82.24.130.

Transportation of cigarettes from a point outside this state to a point in some other state will not be considered a violation of this section provided that the person so transporting such cigarettes has in his possession adequate invoices or delivery tickets which give the true name and address of such out-of-state seller or consignor and such out-of-state purchaser or consignee.

In any case where the department or its duly authorized agent, or any peace officer of the state, has knowledge or reasonable grounds to believe that any vehicle is transporting cigarettes in violation of this section, the department, such agent, or such police officer, is authorized to stop such vehicle and to inspect the same for contraband cigarettes.

For purposes of this section, the term "person authorized by chapter 82.24 RCW to possess unstamped cigarettes" shall mean a wholesaler or retailer licensed pursuant to the provisions of chapter 19.91 RCW, the United States or an agency thereof, *and any Indian tribal organization authorized to possess unstamped cigarettes.*

(Italics ours.) RCW 82.24.250.

Notwithstanding any other provisions of this chapter, a person may acquire and physically possess, if acquired and possessed for purposes other than resale, four hundred or less cigarettes at any single time without incurring tax liability under this chapter, RCW 28A.47.440 and RCW 73.32.130.

RCW 82.24.260.

On March 10, 1972, the Colville Business Council enacted

the Colville Tobacco Ordinance. *See* 37 Fed. Reg. 25181 (1972). This ordinance provides that the sale and distribution of cigarettes and other tobacco products on the reservation shall be a tribal enterprise, conducted through tribal tobacco outlets established on trust lands within the reservation. Each outlet is to be managed by an enrolled member of the Colville confederacy, pursuant to a tribal license and a federal Indian trader's license. All tobacco acquisitions by the tribes pursuant to the ordinance are to be made with federally-restricted tribal funds and remain federally-restricted tribal property until sale to the ultimate consumer. Sales to non-Indians are restricted to two cartons per sale in conformity with the spirit of RCW 82.24.260. Finally, the ordinance imposes a tribal excise tax of 3 cents per package of cigarettes sold on the reservation, to be added to the retail sales price.

On February 28, 1972, Leonard Tonasket was issued a federal Indian trader's license and on May 25, 1972, the Colville confederacy issued him a tribal license as operator of Tobacco Outlet No. 1. Since that time, Mr. Tonasket has been operating his tobacco retail business under the tribal ordinance. Cigarettes for distribution through the tribal outlets are purchased from a distributor located in the state of Oregon, to whom the Bureau of Indian Affairs has also issued a federal Indian trader's license.

It is with this overall background in mind that we turn to the first question we deem subject to our consideration by virtue of the remand by the United States Supreme Court.

HAS THE STATE OF WASHINGTON VALIDLY ASSUMED CIVIL AND CRIMINAL JURISDICTION OVER THE COLVILLE INDIAN RESERVATION AND OTHER RESERVATIONS PURSUANT TO PUBLIC LAW 83-280, CH. 505, 67 STAT. 588?

The pertinent provisions of Public Law 83-280, as it existed in 1965 (the complete text of which is attached as the Appendix to this opinion), provides:

Sec. 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State

to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided,* That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

Sec. 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof.

Act of August 15, 1953, ch. 505, §§ 6 and 7, 67 Stat. 588.

Relevant portions of the Enabling Act, ch. 180, 25 Stat. 676 (1889), providing for the admission of the State of Washington, among others, to the Union reads:

Sec. 4. . . . And said conventions shall provide, by ordinances irrevocable without the consent of the United States and the people of said States:

. . .

Second. That the people inhabiting said proposed States do agree and declare that they forever disclaim *all right and title* to the unappropriated public lands lying within the boundaries thereof, *and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States*; that the lands belonging to citizens of the United States residing without the said States shall never be taxed at a higher rate than the lands belonging to residents thereof; that no taxes shall be imposed by the States on lands or property therein belonging to or which may hereafter be purchased by the United States or reserved for its use. But nothing herein, or in the ordinances herein provided for, shall preclude the said States from taxing as other lands are taxed any lands owned or

held by any Indian who has severed his tribal relations, and has obtained from the United States or from any person a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any act of Congress containing a provision exempting the lands thus granted from taxation; but said ordinances shall provide that all such lands shall be exempt from taxation by said States so long and to such extent as such act of Congress may prescribe.

(Italics ours.)

In keeping with the intent and spirit of this provision of the Enabling Act, the following provisions of Const. art. 26 were incorporated into our state constitution:

The following ordinance shall be irrevocable without the consent of the United States and the people of this state:

. . .

Second. That the people inhabiting this state do agree and declare that they forever disclaim *all right and title* to the unappropriated public lands lying within the boundaries of this state, and *to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States* and that the lands belonging to citizens of the United States residing without the limits of this state shall never be taxed at a higher rate than the lands belonging to residents thereof; and that no taxes shall be imposed by the state on lands or property therein, belonging to or which may be hereafter purchased by the United States or reserved for use: *Provided,* That nothing in this ordinance shall preclude the state from taxing as other lands are taxed any lands owned or held by any Indian who has severed his tribal relations, and has obtained from the United States or from any person a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any act of congress containing a provision exempting the lands thus granted from taxation, which exemption shall continue

so long and to such an extent as such act of congress may prescribe.

(Italics ours.)

The State of Washington accepted and assumed civil and criminal jurisdiction over the Colville Indian Reservation in 1965 based upon the authority of Laws of 1957, ch. 240, as amended by Laws of 1963, ch. 36, codified as RCW 37.12.010, .021, .030, .040, .050, .060, and .070, which provide:

The state of Washington hereby obligates and binds itself to assume criminal and civil jurisdiction over Indians and Indian territory, reservations, country, and lands within this state in accordance with the consent of the United States given by the act of August 15, 1953 (Public Law 280, 83rd Congress, 1st Session), but such assumption of jurisdiction shall not apply to Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States, unless the provisions of RCW 37.12.021 have been invoked, except for the following:

(1) Compulsory school attendance;
(2) Public assistance;
(3) Domestic relations;
(4) Mental illness;
(5) Juvenile delinquency;
(6) Adoption proceedings;
(7) Dependent children; and

(8) Operation of motor vehicles upon the public streets, alleys, roads and highways: *Provided further,* That Indian tribes that petitioned for, were granted and became subject to state jurisdiction pursuant to this chapter on or before March 13, 1963 shall remain subject to state civil and criminal jurisdiction as if chapter 36, Laws of 1963 had not been enacted.

RCW 37.12.010.

Whenever the governor of this state shall receive from the majority of any tribe or the tribal council or other governing body, duly recognized by the Bureau of Indian Affairs, of any Indian tribe, community, band or group in this state a resolution expressing its desire that its people and lands be subject to the criminal or civil jurisdiction of the state of Washington to the full extent authorized

by federal law, he shall issue within sixty days a proclamation to the effect that such jurisdiction shall apply to all Indians and all Indian territory, reservations, country, and lands of the Indian body involved to the same extent that this state exercises civil and criminal jurisdiction or both elsewhere within the state: *Provided,* That jurisdiction assumed pursuant to this section shall nevertheless be subject to the limitations set forth in RCW 37.12.060.

RCW 37.12.021.

Upon March 13, 1963 the state of Washington shall assume jurisdiction over offenses as set forth in RCW 37.12.010 committed by or against Indians in the lands prescribed in RCW 37.12.010 to the same extent that this state has jurisdiction over offenses committed elsewhere within this state, and such criminal laws of this state shall have the same force and effect within such lands as they have elsewhere within this state.

RCW 37.12.030.

Upon March 13, 1963 the state of Washington shall assume jurisdiction over civil causes of action as set forth in RCW 37.12.010 between Indians or to which Indians are parties which arise in the lands prescribed in RCW 37.12.010 to the same extent that this state has jurisdiction over other civil causes of action and, except as otherwise provided in this chapter, those civil laws of this state that are of general application to private persons or private property shall have the same force and effect within such lands as they have elsewhere within this state.

RCW 37.12.040.

The jurisdiction assumed pursuant to this chapter shall be subject to the limitations and provisions of the federal act of August 15, 1953 (Public Law 280, 83rd Congress, 1st Session).

RCW 37.12.050.

Nothing in this chapter shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights and tidelands, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United

States; or shall authorize regulation of the use of such property in a manner inconsistent with any federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the state to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under federal treaty, agreement, statute, or executive order with respect to Indian land grants, hunting, trapping, or fishing or the control, licensing, or regulation thereof.

RCW 37.12.060.

Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the state, be given full force and effect in the determination of civil causes of action pursuant to this section.

RCW 37.12.070.

Pointing to newly discovered legislative history relating to Public Law 83.280,[6] Mr. Tonasket contends that section 6 thereof was specifically drafted, intended, and adopted to apply to states, such as Washington,[7] with Enabling Act and constitutional provisions similar to those set out above. Relying, then, upon *McClanahan v. Arizona State Tax*

---

[6] Appellant asserts that the intent of Congress governing the meaning of Public Law 83-280 has been made more clear by the recent discovery of two of the unpublished reports of the subcommittee and committee hearings on H.R. 1063, *i.e.*, before the Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs, House of Representatives, 83rd Cong., 1st Sess. (June 29, 1953), and the hearing on H.R. 1063 before the Committee on Interior and Insular Affairs, House of Representatives, 83rd Cong., 1st Sess. (July 15, 1953). Apparently this legislative history has been unavailable because it has been on tape at the National Archives in Washington, D.C., and had to be specifically requested; a request for a transcript of these tapes was not made by the Solicitor General until the preparation for the *Tonasket* hearing before the Supreme Court.

[7] Other states having similar Enabling Act and constitutional provisions are: Arizona, Montana, New Mexico, North Dakota, South Dakota, Oklahoma, and Utah.

*Comm'n,* 411 U.S. 164, 36 L. Ed. 2d 129, 93 S. Ct. 1257 (1973). Mr. Tonasket asserts that before this state could validly and effectively assume jurisdiction over any Indian reservation within the state, the people of the state must amend the constitution to so provide. He, therefore, postulates that RCW 37.12 is an insufficient compliance with Public Law 83-280, and State assumption of criminal and civil jurisdiction over Indian reservations pursuant thereto is invalid and ineffective.

■   We cannot agree with Mr. Tonasket's conclusion for two reasons. First, a careful perusal of the relevant provisions of the Enabling Act and Const. art. 26, indicates that insofar as Indian property be involved, the drafters thereof were primarily, if not exclusively, concerned with protecting, from state proprietary interference, the title to and the taxation of Indian lands. Nowhere in these disclaimer provisions is the purely governmental function of state criminal and civil regulations either alluded to or expressly forbidden. The fact that Congress in the past has, in one fashion or another, preempted on behalf of the federal government some criminal and civil jurisdiction over Indian tribes and reservations in this state, as well as others, does not import into our Enabling Act and Const. art. 26 restrictive language which is not there. Neither would it seem appropriate to conclude that opinions voiced by members of a congressional committee considering the provisions of Public Law 83-280 prior to its passage constitute a conclusive and binding interpretation of the disclaimer provisions.

On this score, it is further argued, that the clause in the disclaimer provisions retaining in Congress "absolute jurisdiction and control" over Indian lands is exclusive of any state governmental jurisdiction on reservations absent explicit congressional consent. Such has not, however, been the view of the United States Supreme Court with respect to this clause, both prior and subsequent to Public Law 83-280. *Draper v. United States,* 164 U.S. 240, 41 L. Ed. 419, 17 S. Ct. 107 (1896); *Organized Village of Kake v. Egan,* 369 U.S. 60, 7 L. Ed. 2d 573, 82 S. Ct. 562 (1962).

In *Draper,* the court held that the "absolute jurisdiction and control" clause did not oust state jurisdiction over criminal offenses committed by non-Indians on Indian reservations. In *Kake* at page 69, the court noted that a disclaimer in statehood acts "was a disclaimer of proprietary rather than governmental interest," and that "absolute jurisdiction" meant undiminished, not exclusive jurisdiction. The court then went on to state that:

> even on reservations state laws may be applied to Indians unless such application would interfere with reservation self-government or impair a right granted or reserved by federal law.

*Organized Village of Kake v. Egan, supra* at 75.

On this ground then, we conclude that amendment of our state constitution was not necessary to permit assumption of civil and criminal jurisdiction pursuant to Public Law 83-280.

A second reason for concluding that this state has legally and properly assumed the challenged jurisdiction springs from the consent given to the states under section 6 of Public Law 83-280 to amend their constitutions "where necessary" to remove any legal impediment to assumption of the jurisdiction authorized. The "where necessary" clause, in our view, would appear to imply that the question of whether a state constitutional amendment be necessary to comply with Public Law 83-280 is essentially one for state resolution.

We have consistently held that provisions of the Enabling Act and Const. art. 26, providing that the disclaimer compact be irrevocable "without the consent of the United States and the people of this state," contemplated the United States speaking through Congress and the people of this state speaking through the legislature, rather than the people of this state being compelled to voice their consent by way of constitutional amendment. *Boeing Aircraft Co. v. Reconstruction Fin. Corp.,* 25 Wn.2d 652, 171 P.2d 838, 168 A.L.R. 539 (1946); *State v. Paul,* 53 Wn.2d 789, 337 P.2d 33, *appeal dismissed,* 361 U.S. 898, 4 L. Ed. 2d 155, 80 S. Ct. 203

(1959); and *Makah Indian Tribe v. State,* 76 Wn.2d 485, 457 P.2d 590 (1969), *appeal dismissed,* 397 U.S. 316, 25 L. Ed. 2d 335, 90 S. Ct. 1115 (1970).

Accordingly, we determined that a constitutional amendment was unnecessary in this state to permit valid and effective state assumption of civil and criminal jurisdiction over an Indian reservation pursuant to Public Law 83-280. *State v. Paul, supra; Makah Indian Tribe v. State, supra.*

This view also finds support in other state and federal decisional law. *State ex rel. McDonald v. District Court,* 159 Mont. 156, 496 P.2d 78 (1972); *Quinault Tribe of Indians v. Gallagher,* 368 F.2d 648 (9th Cir. 1966), *cert. denied,* 387 U.S. 907 (1967).

We find no mandate in *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 36 L. Ed. 2d 129, 93 S. Ct. 1257 (1973), or in *Kennerly v. District Court,* 400 U.S. 423, 27 L. Ed. 2d 507, 91 S. Ct. 480 (1971), compelling a reversal of the approach taken in the *Paul, Makah,* and *Quinault* cases. These cases enunciate a position this state has taken with 10 of its some 22 tribes commencing in 1957 with assumption of criminal and civil jurisdiction over their reservations at their request. To now uproot the intergovernmental relationship that has developed over the years since 1957, by reversing our field and holding that state jurisdiction was ineffectively invoked is, in our view, legally unnecessary and would be not only unwise but manifestly unfair and unjust to those who have in good faith relied upon that jurisdiction or been affected by it.

We thus answer the first question in the affirmative.

DOES PUBLIC LAW 83-280 GRANT THE STATE OF WASHINGTON AUTHORITY TO EXTEND ITS CIVIL EXCISE TAX LAWS TO INDIAN RETAILERS, WHO SERVE NON-INDIAN CONSUMERS, WITHIN THE EXTERIOR BOUNDARIES OF AN INDIAN RESERVATION?

The affirmative answer to this question was thoroughly discussed and analyzed in our original opinion in this case. *Tonasket v. State,* 79 Wn.2d 607, 488 P.2d 281

(1971). We feel compelled to reaffirm the basic answer insofar as it relates to the sale of cigarettes to non-Indians, with the exception hereinafter noted in connection with Laws of 1972, 1st Ex. Sess., ch. 157, §§ 6 and 7. In so doing, we note that this case does not involve a tax on trust lands, personalty, inventory, gross receipts, or income. Neither has the State, according to its brief filed herein, sought or undertaken to impose the cigarette tax upon on-reservation retail sales of cigarettes by Mr. Tonasket to enrolled reservation Indians. Indeed, assuming that Mr. Tonasket could pursuant to 25 U.S.C. § 264 (1882) and 25 C.F.R. 251.3 (1973), be characterized as an authorized, though unlicensed, Indian trader from the mid-1960's to the date of his actual licensing, it would be dubious, to say the least, whether the State could compel him to affix cigarette tax stamps or collect a retail sales tax in connection with his retail transactions with reservation Indians. *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 14 L. Ed. 2d 165, 85 S. Ct. 1242 (1965). *See also* the conditional approval of the Colville Tobacco Ordinance by the Deputy Commissioner of the Bureau of Indian Affairs, 37 Fed. Reg. 25182 (1972).

The tax here sought to be imposed upon Mr. Tonasket's cigarette sales to non-Indians is, among other things, one levied upon the "use" and "consumption" of the cigarettes. By Laws of 1972, 1st Ex. Sess., ch. 157, § 4, the legislature amended RCW 82.24.080,[8] by proclaiming it to be also the

[8] "It is the intent and purpose of this chapter to levy a tax on all of the articles taxed herein, sold, used, consumed, handled, possessed, or distributed within this state and to collect the tax from the person who first sells, uses, consumes, handles, possesses (either physically or constructively, in accordance with RCW 82.24.020) or distributes them in the state. It is further the intent and purpose of this chapter that whenever any of the articles herein taxed is given away for advertising or any other purpose, it shall be taxed in the same manner as if it were sold, used, consumed, handled, possessed, or distributed in this state.

"It is also the intent and purpose of this chapter that the tax shall be imposed at the time and place of the first taxable event occurring, within this state: *Provided, however*, That failure to pay the tax with respect to a taxable event shall not prevent tax liability from arising by reason of a subsequent taxable event." RCW 82.24.080.

intent of the chapter that the cigarette tax be imposed at the time and place of the first taxable event. If this legislative declaration be an expression of what the legislature always intended with respect to RCW 82.24.080, then, since Mr. Tonasket was purchasing cigarettes from an Oregon distributor for resale to reservation Indians as well as to non-Indians, it would appear logical to conclude that the first taxable event would be the resale of the cigarettes to a non-Indian, at which time Mr. Tonasket could be required to affix the tax stamp and collect the amount of the tax from the non-Indian customer. Incidentally, he would, of course, be entitled to compensation pursuant to RCW 82.24.070 for his services in affixing the stamps. He would likewise be required in connection with his retailing activities with non-Indians to obtain a retailer's license pursuant to RCW 19.91.120 and .130 and pay the rather de minimus fee provided therefor by RCW 19.91.130, as well as register as a retailer pursuant to RCW 82.32.030.

Accordingly, in keeping with our view heretofore expressed in *Tonasket v. State, supra,* we hold that Public Law 83-280 grants authority to the State to extend its cigarette excise tax to Indian retailers serving non-Indian consumers within the boundaries of a reservation over which state civil and criminal jurisdiction has been assumed.

Do LAWS OF 1972, 1ST EX. SESS., CH. 157, §§ 6 and 7, EXEMPT INDIAN RETAILERS FROM COLLECTION OF THE STATE CIGARETTE EXCISE TAX?

As may be noted hereinbefore, section 6, codified as RCW 82.24.250, in pertinent part defines a " 'person authorized by chapter 82.24 RCW to possess unstamped cigarettes' " as including any Indian tribal organization authorized to possess unstamped cigarettes. Section 7, codified as RCW 82.24.260, authorizes acquisition and possession of two cartons or less of unstamped cigarettes by any person for purposes other than resale.

As indicated by Governor Evans in his veto message relating to an item veto in section 6, at least one of the

purposes of the amendatory provisions amounted to an attempt to alleviate controversy between state taxing authorities and on-reservation Indian cigarette retailers which has resulted in litigation such as this. *See* Veto Message, Laws of 1972, ch. 157, p. 524-25.

Following on the heels of this amendatory legislation, as has been noted, the Colville Tobacco Ordinance was passed and received official approval. 37 Fed. Reg. 25181 (1972). By the terms of this ordinance, the acquisition and retailing of cigarettes became a tribal enterprise and Mr. Tonasket was not only officially licensed as an Indian trader but also tribally licensed to operate one of the tribal outlets. In keeping with the spirit of section 7, RCW 82.24.260, retail sales to non-Indians were restricted by the ordinance to two cartons per sale.

We are satisfied that: (a) the Colville Tobacco Ordinance is not inconsistent with sections 6 and 7, RCW 82.24.250 and .260; (b) the tribal organization is one authorized to acquire and possess unstamped cigarettes within the spirit and intent of section 6; and (c) the tribal outlet managed by Mr. Tonasket is authorized by section 7, RCW 82.24.260, to retail to non-Indians not to exceed two cartons of unstamped cigarettes per person at any single time. Retail sales to non-Indians in excess of the latter limitation would, however, become subject to the tax.

Summarizing, we hold: (1) the State validly assumed civil and criminal jurisdiction over the Colville Confederated Indian Reservation; (2) Public Law 83-280 permits extension of the state cigarette excise tax to Mr. Tonasket's retail sales to non-Indians; (3) in February 1967, Mr. Tonasket was entitled to have unstamped cigarettes in his possession for resale to reservation Indians; and (4) subsequent to the effective date of RCW 82.24.250 and .260, Mr. Tonasket is authorized to sell at retail to non-Indians not more than two cartons per person of unstamped cigarettes.

Accordingly, the initial order of dismissal is vacated and the cause is remanded to the Superior Court for such relief

as shall be consistent herewith, including the return of such cartons of cigarettes as Mr. Tonasket may establish were in his possession for retail to Indian customers.

HALE, C.J., FINLEY, ROSELLINI, WRIGHT, and BRACHTEN-BACH, JJ., and JOHNSON, J. Pro Tem., concur.

APPENDIX

Public Law 280                                      CHAPTER 505

AN ACT

To confer jurisdiction on the States of California, Minnesota, Nebraska, Oregon, and Wisconsin, with respect to criminal offenses and civil causes of action committed or arising on Indian reservations within such States, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That chapter 53 of title 18, United States Code, is hereby amended by inserting at the end of the chapter analysis preceding section 1151 of such title the following new item:

"1162. State jurisdiction over offenses committed by or against Indians in the Indian country."

Sec. 2. Title 18, United States Code, is hereby amended by inserting in chapter 53 thereof immediately after section 1161 a new section, to be designated as section 1162, as follows:

"§ 1162. State jurisdiction over offenses committed by or against Indians in the Indian country

"(a) Each of the States listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over offenses committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country as they have elsewhere within the State:

| "State of | Indian country affected |
|---|---|
| California | All Indian country within the State |
| Minnesota | All Indian country within the State, except the Red Lake Reservation |
| Nebraska | All Indian country within the State |
| Oregon | All Indian country within the State, except the Warm Springs Reservation |
| Wisconsin | All Indian country within the State, except the Menominee Reservation |

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsist-

ent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

"(c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section."

Sec. 3. Chapter 85 of title 28, United States Code, is hereby amended by inserting at the end of the chapter analysis preceding section 1331 of such title the following new item:

"1360. State civil jurisdiction in actions to which Indians are parties."

Sec. 4. Title 28, United States Code, is hereby amended by inserting in chapter 85 thereof immediately after section 1359 a new section, to be designated as section 1360, as follows:

"§ 1360. State civil jurisdiction in actions to which Indians are parties

"(a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action, *and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State*: (Italics ours.)

| "State of | Indian country affected |
| --- | --- |
| California | All Indian country within the State |
| Minnesota | All Indian country within the State, except the Red Lake Reservation |
| Nebraska | All Indian country within the State |
| Oregon | All Indian country within the State, except the Warm Springs Reservation |
| Wisconsin | All Indian country within the State, except the Menominee Reservation |

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

"(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section.".

Sec. 5. Section 1 of the Act of October 5, 1949 (63 Stat. 705, ch.

604), is hereby repealed, but such repeal shall not affect any proceedings heretofore instituted under that section.

Sec. 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State *to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act*: (Italics ours.) *Provided,* That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

Sec. 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof.

Approved August 15, 1953.

(Public Law 83-280, Act of August 15, 1953, ch. 505, 67 Stat. 588.)

UTTER, J. (dissenting)—I dissent. I believe the State of Washington has not properly assumed jurisdiction over the Indian reservations within this state, pursuant to Public Law 83-280, ch. 505, 67 Stat. 588.

The majority finds state jurisdiction over the Indian reservations on two rationales. It is argued that "[t]o now uproot the intergovernmental relationship that has developed over the years since 1957, by reversing our field and holding that state jurisdiction was ineffectively invoked is, in our view, legally unnecessary and would be not only unwise but manifestly unfair and unjust to those who have in good faith relied upon that jurisdiction or been affected by it."

The majority also contends that the legislature's enactment of RCW 37.12 is a sufficient compliance with Public Law 83-280 to vest jurisdiction in the State over Indian reservations. This conclusion is supported by two theories. First, the Enabling Act[9] and Const. art. 26[10] concern them-

---

[9]"Sec. 4. That the delegates to the conventions elected as provided for in this act shall meet at the seat of government of each of said Territories . . . on the fourth day of July, eighteen hundred and eighty-nine, and, after organization, shall declare, on behalf of the people of said proposed States, that they adopt the Constitution of the

selves with protecting Indian rights in land from the State's interference but not other Indian rights. Second, the "where necessary"[11] clause in Public Law 83-280 is a question of state law already resolved by this court in our earlier cases. Those cases held that it was not necessary to amend our state constitution prior to assuming Indian jurisdiction pursuant to Public Law 83-280.

Our Enabling Act is a federal statute. No better source

United States; whereupon the said conventions shall be, and are hereby, authorized to form constitutions and States governments for said proposed states, respectively . . . And said conventions shall provide, by ordinances irrevocable without the consent of the United States and the people of said States:

". . .

"Second. That the people inhabiting said proposed States do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; . . ." 25 Stat. 676 § 4 (1889).

[10]"The following ordinance shall be irrevocable without the consent of the United States and the people of this state:

". . .

"Second. That the people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries of this state, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States . . ." Const. art. 26.

[11]"Sec. 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, *where necessary*, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided*, That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be." (First italics mine.) Act of August 15, 1953, ch. 505, § 6, 67 Stat. 588.

may be found than the Congress itself for determining the meaning of a congressional act. If, as the majority states, our Enabling Act was not meant to restrict our state's civil and criminal jurisdiction over Indian activities on Indian reservations within the state, then Public Law 83-280 is mere surplusage. Under the majority's reasoning, Public Law 83-280 conditionally vests power in the State to do that which the original Enabling Act never precluded the State from doing—exercise civil and criminal jurisdiction over the Indian tribes and reservations in this state. The colloquy in the committee hearing on H.R. 1063 contradicts such an expansive reading of state jurisdiction over Indian reservations. It indicates that Congress, the creator of Public Law 83-280, never intended such a result. The committee members stated:

> Mr. Berry. Mr. Chairman, I would like to ask a question. Would it not be better to word that to say that this "shall be applicable," instead of saying "consent is hereby granted." Why not say "The provisions of the law shall be applicable" to these states wherein they do these things. Mr. Westland. I believe the law would then be applicable to them, once they had taken this affirmative action. Mr. Rhodes. Will the gentleman yield. You cannot very well allow enabling legislation to be amended merely by giving consent. There has to be specific legislation. Mr. Dawson. That brings up another question: Whether your wording should refer to the Enabling Act. You say "We hereby give our consent for them to amend their state constitution." Their state constitution was based upon the Enabling Act. In other words, they followed that. I wonder whether we should have something in there to say "Not withstanding any restrictions in the Enabling Act, consent is hereby given to amend their state constitution." Mr. Abbott. (Counsel) I believe that clause "notwithstanding any provisions of the Enabling Act" for such states might well be included. It would make clear that Congress was repealing the Enabling Act. Mr. Dawson. To give permission to amend their constitution. Mr. Abbott. (Counsel) I think that would help clarify the intent of the committee at the present time and of Congress if they favorably acted on the legislation.

Hearings on H.R. 1063 before the House Comm. on Interior and Insular Affairs, 83rd Cong., 1st Sess., at 8-9 (July 15, 1953).

There would have been no need for Congress to repeal our Enabling Act if it had not been an impediment to our state's assumption of civil and criminal jurisdiction over Indian reservations. I therefore cannot agree with the majority analysis insofar as it determines that the Enabling Act restrictions pertained only to ownership in and taxing power over Indian land.

The majority contends that the people of this state have spoken through the legislature in the form of a legislative act, RCW 37.12, and that the Enabling Act does not require a constitutional amendment in which each registered citizen has his own individual say on the issue. The legislature does not function in such a manner.

When the legislature speaks, it speaks on behalf of the people only. The Congress was well aware of this crucial distinction between the people speaking for themselves and representational speech where a few are authorized to bind the many when our Enabling Act was drafted. Section 4 of the Enabling Act states that "the delegates to the conventions . . . shall declare, *on behalf of the people* of said proposed States, that they adopt the Constitution of the United States . . ." (Italics mine.) In that same section of the Enabling Act the Congress expressed its will as to the participation of the people themselves, not their mere representatives, stating "[a]nd said conventions shall provide, by ordinances irrevocable without the consent of . . . the people of said States: . . . That the people . . . do agree and declare . . . [that] said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; . . ." This clear distinction made by Congress in the Enabling Act between the people acting through their representatives and the people acting directly in their own capacity leaves no doubt in my mind as to the meaning which Congress

intended when it used the phrase "the people of said States."

It was under the express mandate of the congressional Enabling Act that the drafters of our constitution incorporated that Act's identical language in Const. art. 26: "The following ordinance shall be irrevocable without the consent of the United States and the people of this state:" This court stated in *Boeing Aircraft Co. v. Reconstruction Fin. Corp.*, 25 Wn.2d 652, 171 P.2d 838, 168 A.L.R. 539 (1946), that the phrase in Const. art. 26 "without the consent of . . . the people of this state" meant the legislative representatives of the people rather than each citizen acting for himself in the form of a constitutional amendment.

In *Boeing*, King County sought to assess taxes against certain real property owned by the Reconstruction Finance Corporation and used by Boeing Aircraft Company. The Boeing lease provided that Boeing should pay all property taxes lawfully assessed or imposed upon real property. Boeing refused to pay the taxes as not being lawfully assessed. In determining that the taxes so imposed were properly assessed against the property, we construed sections of our Enabling Act, constitution, federal and state statutes. The court concluded that our legislature could enact legislation and thereby consent for the people of Washington, as required by Const. art. 26, to the imposition of such taxes pursuant to the federal law. However, other events contemporary with the *Boeing* decision indicate that the "consent of the . . . people of this state" to authorize the tax was achieved by a constitutional amendment voted by the people and not through legislative enactment. The *Boeing* decision was filed on August 12, 1946. The constitutional amendment allowing the tax was approved by the vote of the people on the November 1946 ballot. *State v. Paul*, 53 Wn.2d 789, 337 P.2d 33 (1959), and *Makah Indian Tribe v. State*, 76 Wn.2d 485, 457 P.2d 590 (1969), which the majority also cites, rely on the doubtful analysis found in *Boeing*.

Because of the way in which the Washington Territory

became the State of Washington, this court as the highest appellate court of the state is not the ultimate arbiter of the meaning of our state constitution in its every particular. The Territory of Washington became the State of Washington only because representatives of the people of the Territory of Washington agreed to fulfill certain conditions imposed upon those representatives by the Congress. One of the conditions imposed was that the Washington State Constitutional Convention delegates would include in our state constitution a provision that the United States Congress should continue to have absolute jurisdiction and control over the Indian reservations. It specifically stated it could not be changed without the consent of the United States and the people of this state. This congressional condition precedent to the formation of our state was fulfilled by Const. art. 26. Thus, this court must look to federal law, the Enabling Act, and to the pronouncements of the members of that branch of government which created the conditions that had to be met before statehood was accorded Washington to determine the meaning of the phrase in Const. art. 26 "consent of the . . . people of this state," engrafted from the congresssional Enabling Act. The meaning which Congress attaches to that phrase is made clear in the informed House Committee Hearing on Public Law 83-280. Mr. Abbott, counsel to the committee, first stated:

> The bill does not as acted upon by the committee make provision for eight states which have constitutional organic impediments for accepting state jurisdiction. The enabling act for Arizona, Montana, New Mexico, North Dakota, South Dakota, Oklahoma, Utah, and Washington provided that exclusive Federal jurisdiction would be retained.
>
> The Indian Bureau in listing states pointed out that those eight states now have organic law impediments in their constitutions or other laws which would not enable them to take on state jurisdiction. . . .
>
> I have handed to Mr. Young a proposed amendment which would provide for the granting of consent to states having organic law impediments. At such time as they remove those impediments by action of the people in the

state, they could then take over the exclusive civil and criminal jurisdiction over Indians and Indian matters.

In addition, Mr. Westland's state [Washington], which is one state which has a constitutional impediment, the one section provides for removal by the state of constitutional impediments. The other section would apply to any other of the 15 Indian states, so that they by affirmative legislative action could assume either criminal or civil jurisdiction, or both, at such time as the matter were laid before the legislative bodies.

In short the legislation as acted upon by the committee would apply to only five states. The two additional section amendments would apply first to the eight states having constitutional or organic law impediments and would grant consent of the United States for them to remove such impediments and thus acquire jurisdiction.

The other amendment would apply to any other Indian states, some 15 or 18, who would acquire jurisdiction at such time as the legislative body affirmatively indicated their desire to so assume jurisdiction.

Hearings on H.R. 1063 before the House Comm. on Interior and Insular Affairs, 83rd Cong., 1st Sess., at 2-4 (July 15, 1953).

In a subcommittee hearing on H.R. 1063, Harry A. Sellery, Chief Counsel for the Bureau of Indian Affairs, and William R. Benge, Chief of the Branch of Law and Order of the Bureau of Indian Affairs, presented the final version of Public Law 83-280. There the language of section 6 of the Act authorizing "the people of any State to amend . . . their State constitution" was brought into sharp focus:

Mr. Abbott (Counsel to Committee). Mr. Benge informs me there are 26 states shown there as having Indian populations. You can correct it for the record, Mr. Benge, but I believe several of those states have constitutional prohibitions against jurisdiction. Mr. Benge. Yes, sir; that is right. Mr. Abbott. Which would mean that there would be apparently no jurisdiction. Mr. Benge. It would require amendment to a state constitution in most cases, on the ones that Mr. Abbott is speaking of. The Organic Act which admitted the state to the union and the state constitution would have to be amended. The state constitution in consequence of the Organic Act denied jurisdic-

tion over crimes committed by Indians on their reservations. To meet that the State Legislature would have to amend the constitution.

I take it that a general bill like this would be regarded as authority by the Congress for them to amend their constitutions. It would be regarded as an amendment to the Organic Act.

Mr. Aspinall. The State Legislature would not do it. The people of the state themselves would have to do it.

Mr. Benge. Yes, sir.

Hearings on H.R. 1063 before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs, 83rd Cong., 1st Sess., at 23-24 (June 29, 1953).

I believe these colloquies demonstrate Congress' intent that section 6 of Public Law 83-280 authorizes Washington to assume Indian jurisdiction not by legislative action but only conditionally upon amendment of our state constitution. Accordingly, I do not believe this court has jurisdiction over the case. For the reasons stated, I dissent.

STAFFORD, J., concurs with UTTER, J.

Petition for rehearing denied October 1, 1974.