[No. 41640.    En Banc.    September 2, 1971.]

LEONARD TONASKET, *Appellant,* v. THE STATE OF WASHINGTON et al., *Respondents.*

*Ziontz, Pirtle & Fulle,* by *Robert L. Pirtle* and *Mason D. Morisset,* for appellant.

*Slade Gorton, Attorney General, Michael B. Hansen* and *Timothy R. Malone, Assistants,* for respondents.

608

ROSELLINI, J.—The plaintiff is a Colville Indian of full blood, who owns a store on allotted land which is held in trust by the United States Government. His business is mainly that of selling cigarettes, and he sells approximately 400 cartons each day. His customers are Indians and non-Indians, but the majority are nonIndians.

The plaintiff has operated without the license required by RCW 19.91.120 and has not registered with the State of Washington as required by RCW 82.32.030. Furthermore, he has not complied with the requirements of RCW 82.24.050, which impose upon the cigarette retailer the duty of affixing tax stamps to cigarettes sold. The tax on 400 cartons of cigarettes would have been $440, so the state was losing at least $13,200 per month as a result of the plaintiff's operations.

In February of 1967, agents of the Washington State Department of Revenue entered the plaintiff's store, on reservation land,[1] and seized cigarettes which he had in stock. They placed the plaintiff under arrest and charged him by information with violation of the requirements of these statutes. Violations in each instance carry criminal penalties.

After the information was filed, the plaintiff brought this action for a declaratory judgment. In his complaint he declared that he was and had been in the business of selling cigarettes without affixing the tax stamps required by state law. He further declared that it was his intention in the future to expand his mercantile operation and sell other items of merchandise, including but not limited to items of wearing apparel, and appliances. He declared that it was his intention not to collect the tax imposed by statute upon sales in the state of Washington. He also declared his intent to become a vendor of liquor by the bottle, but later abandoned this declaration.

The plaintiff asked the court to declare his right to do business with Indians and nonIndians free of the require-

---

[1] The part of the reservation on which the store is situated is within the city of Omak.

ments of the state laws pertaining to the collecting and remitting of retail sales taxes. He further asked that the Washington State Department of Revenue be enjoined from harassing him by attempting to enforce these laws.

This relief was denied by the trial court and the action was dismissed, the court finding that the plaintiff is subject to the laws of the State of Washington in the operation of his retail cigarette business.

The single question on this appeal is whether the Colville Confederated Tribes of the State of Washington and its members, by accepting the criminal and civil jurisdiction of the state, authorized by Public Law 83-280, ch. 505, 67 Stat. 588, have agreed to be bound by the particular statutes, the terms of which the plaintiff has admittedly violated.

The answer lies in the scope of Public Law No. 83-280, authorizing states to assume criminal and civil jurisdiction of Indian tribes, and RCW 37.12, wherein this state declared that, upon receipt of a resolution from any tribe expressing its desire that its people be subject to such jurisdiction, the Governor shall issue a proclamation that such jurisdiction shall apply. The constitutionality of this method of assuming jurisdiction over Indian tribes has been tested in this court and has been sustained. *Makah Indian Tribe v. State,* 76 Wn.2d 485, 457 P.2d 590 (1969); *State v. Bertrand,* 61 Wn.2d 333, 378 P.2d 427 (1963); *State v. Paul,* 53 Wn.2d 789, 337 P.2d 33 (1959), *appeal dismissed,* 361 U.S. 898, 4 L. Ed. 2d 155, 80 S. Ct. 203 (1959).

Public Law No. 83-280 (67 Stat. 588), which was enacted in 1953 and was in effect when this lawsuit arose, provided, *inter alia,* that certain named states should have jurisdiction over offenses committed by or against Indians on or off the reservation to the same extent that those states had jurisdiction over offenses committed elsewhere within the state and that the criminal laws of such state should have the same force and effect within such Indian country as they had elsewhere with the state. (Section 2.) It further provided in section 4 that each of those listed states should have jurisdiction over civil causes of action between Indi-

ans or to which Indians were parties, which arose in Indian country, to the same extent that they had jurisdiction over other civil causes, and that

> those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State . . .

Section 2 contained the following limitation:

> (b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

Section 4, conferring civil jurisdiction, contained the following limitation:

> (b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

and this reservation:

> (c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil

law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section.

It will be noted that these sections, by their terms, applied only to the states listed therein. However, in sections 6 and 7, the Congress authorized other states to assume criminal and civil jurisdiction.

In 1968, after this action was instituted, Congress amended section 7 by Public Law 90-284, Title IV, § 401, April 11, 1968, 82 Stat. 78, and added a requirement that before assumption of jurisdiction, a state must obtain the consent of the Indian tribe occupying the particular Indian country or part thereof which could be affected. This is the present law. *See* 25 U.S.C. § 1321 (1968). Although consent of the tribe was not required by federal law when Washington assumed jurisdiction over the Colville tribe, by its own statute it had made consent a prerequisite for the type of jurisdiction which it asserted over the plaintiff when it caused his arrest for the offenses involved in his sale of cigarettes.

RCW 37.12.021 provides:

> Whenever the governor of this state shall receive from the majority of any tribe or the tribal council or other governing body, duly recognized by the Bureau of Indian Affairs, of any Indian tribe, community, band or group in this state a resolution expressing its desire that its people and lands be subject to the criminal or civil jurisdiction of the state of Washington to the full extent authorized by federal law, he shall issue within sixty days a proclamation to the effect that such jurisdiction shall apply to all Indians and all Indian territory, reservations, country, and lands of the Indian body involved to the same extent that this state exercises civil and criminal jurisdiction or both elsewhere within the state: *Provided,* That jurisdiction assumed pursuant to this section shall nevertheless be subject to the limitations set forth in RCW 37.12.060.

As the plaintiff admits in his brief, on January 13, 1965, the Colville Business Council issued resolution 1965-4, requesting the state to assume criminal and civil jurisdiction over the Colville tribe. On January 29, 1965, Governor Dan-

iel J. Evans issued a proclamation assuming jurisdiction over the tribe.

Thus the state has been authorized to assume and has assumed jurisdiction over offenses and civil disputes occurring on Indian reservations and involving Indians, and the question is whether there is any limitation upon that jurisdiction other than those limitations set forth in Public Law No. 83-280. The specified restrictions upon state exercise of jurisdiction are designed to protect from state interference property held in trust for the Indians by the federal government or upon which there exists a restriction against alienation and the fishing, trapping and hunting rights of the Indian. The plaintiff does not contend that the action of the state in this case violates these limitations. Rather his position is that it was not the intent of Congress to authorize states to apply their revenue laws to business activities of Indians.

The trial court was of the opinion that the authorization contained in Public Law No. 83-280 was plenary, with only the limitations expressed therein, and gave the states power to regulate the merchandising activities of Indians in the same way that they regulate such activities of their citizens generally, and to levy excise taxes upon them. We agree.

The plaintiff does not argue that the act is ambiguous, but the thrust of his argument seems to be that the Congress had in mind certain limitations upon the exercise of state jurisdiction which it did not set forth in the law which it enacted. It is well settled that the court will not read into an act provisions which the court conceives that the legislative body has unintentionally omitted. *Department of Labor & Indus. v. Cook,* 44 Wn.2d 671, 269 P.2d 962 (1954). Furthermore, we cannot assume that the legislative body had in mind exceptions which it did not express when we have before us an act in which certain exceptions are clearly and concisely set forth. To use the venerable phrase, expressio unius est exclusio alterius. As expressed in more contemporary language in *State v. Roadhs,* 71 Wn.2d 705,

430 P.2d 586 (1967), affirmative specification excludes implication.

Public Law No. 83-280 clearly forbids a state to tax property held in trust for Indians over whom it assumes jurisdiction or to take other specified actions in relation to that property. The section protecting fishing, trapping and hunting rights would undoubtedly prohibit a tax or regulation which operated to deprive the Indian of those rights. But there is expressed in the act no other limitation upon the right of the state to impose taxes upon and regulate the activities of an Indian under its general laws applicable to all citizens. Under the rules of interpretation which we have stated, there is no room to imply other limitations upon the operation of the general laws of the state.

If there were any doubt in our minds that it was the intent of Congress to make all the laws of the state, with their benefits and their burdens, applicable to the consenting tribes and their members (with exceptions noted), that doubt would be resolved by an examination of the committee report upon which the Congress acted when it passed Public Law No. 83-280. We think the purpose is manifest in the language used in the act, giving it its ordinary and commonly understood meaning, and the record shows that the purpose expressed was indeed the purpose intended.

In Senate Report No. 699, which repeats in substance House Report No. 848 on House Resolution 1063 (which became Public Law No. 83-280), the following statement regarding the act and certain companion legislation appears:

> Your Committee on Interior and Insular Affairs, through its Indian Affairs Subcommittee, and with the continuing cooperation of the Secretary of the Interior and the Indian Bureau, has, during this session, operated in five major areas of legislation affecting the Indians. This legislation, whether before the House or presently under committee consideration, has two coordinate aims: First, withdrawal of Federal responsibility for Indian affairs wherever practicable; and second, termination of

the subjection of Indians to Federal laws applicable to Indians as such.

U.S.C. Cong. & Admin. News 2409 (1953).

The report drew attention to the fact that, owing to the lack of state jurisdiction to prosecute offenses and limitations upon the federal jurisdiction, as a practical matter enforcement of law within the reservation had been left largely to the Indian groups themselves, and that Indian tribes often are not sufficiently organized to preserve law and order on the reservation. The report said:

> [C]onsequently, there has been created a hiatus in law-enforcement authority that could best be remedied by conferring criminal jurisdiction on States indicating an ability and willingness to accept such responsibility.

U.S.C. Cong. & Admin. News 2412 (1953).

Upon the question of civil jurisdiction, the report stated:

> Similarly, the Indians of several States have reached a stage of acculturation and development that makes desirable extension of State civil jurisdiction to the Indian country within their borders. Permitting the State courts to adjudicate civil controversies arising on Indian reservations, and to extend to those reservations the substantive civil laws of the respective States insofar as those laws are of general application to private persons or private property, is deemed desirable.
>
> After consideration of the proposed legislation, the committee concluded that: any legislation in this area should be on a general basis, making provision for all affected States to come within its terms; that the attitude of the various States and the Indian groups within those States on the jurisdiction transfer question should be heavily weighed before effecting transfer; and that any recommended legislation should retain application of Indian tribal customs and ordinances to civil transactions among the Indians, insofar as these customs or ordinances are not inconsistent with applicable State laws.

U.S.C. Cong. & Admin. News 2412 (1953).

We cannot conceive that it was the intent of Congress to extend to Indians only the protection and benefits of state laws, with none of their attendant duties and responsibili-

ties, and we find no such intention expressed in the statute. True, there are certain immunities and protections afforded the Indians in the enjoyment of their trust properties and their rights of fishing, trapping and hunting. These place the Indian in a position of advantage not shared by other citizens.

This court has been liberal in its interpretation of the provision forbidding states which assume jurisdiction from placing burdens upon trust property. In *Snohomish County v. Seattle Disposal Co.*, 70 Wn.2d 668, 425 P.2d 22 (1967), we held that a zoning restriction could not be given effect to restrict the use of property upon which there was a restraint against alienation, even though that property had been leased to nonIndians.

The Supreme Court of the United States has not gone so far in protecting allotted and restricted lands from encumbrance. In *Oklahoma Tax Comm'n v. Texas Co.*, 336 U.S. 342, 93 L. Ed. 721, 69 S. Ct. 561 (1949), it held that the interests of nonIndian lessees in such lands were subject to state gross production taxes on petroleum produced from such lands, overruling a number of cases which had held to the contrary and reaffirming *Thomas v. Gay*, 169 U.S. 264, 42 L. Ed. 740, 18 S. Ct. 340 (1898), wherein the court had sustained a state tax on cattle grazing on tribal lands leased from Indians by the nonIndian owner of the cattle. The court found that any burden upon the land resulting from such a tax was too remote to justify a rule which would aid the lessee in escaping a nondiscriminatory tax to which he would otherwise be subject and thus to thwart the taxing power of the state.[2]

The court quoted with approval the following excerpt from *Helvering v. Mountain Producers Corp.*, 303 U.S. 376,

---

[2]We dealt with a question concerning the imposition of the tax on wholesalers in *Makah Indian Tribe v. Tax Comm'n*, 72 Wn.2d 613, 434 P.2d 580 (1967), and reached a result in harmony with that of the United States Supreme Court in *Oklahoma Tax Comm'n v. Texas Co.*, 336 U.S. 342, 93 L. Ed. 721, 69 S. Ct. 561 (1949). Note that there was no showing in that case that the Makahs submitted to the jurisdiction of the state under RCW 37.12.021, as authorized by Public Law No. 83-280.

82 L. Ed. 907, 58 S. Ct. 623 (1938), wherein it noted the supposed truism that the power to tax is the power to destroy,[3] and said:

> "In numerous decisions we have had occasion to declare the competing principle, buttressed by the most cogent considerations, that the power to tax should not be crippled 'by extending the constitutional exemption from taxation to those subjects which fall within the general application of nondiscriminatory laws, and where no direct burden is laid upon the governmental instrumentality and there is only remote, if any, influence upon the exercise of the functions of government.' *Willcuts* v. *Bunn*, 282 U. S. 216, 225, and illustrations there cited." 303 U. S. at 385.

336 U.S. at 361.

This opinion of the United States Supreme Court would indicate that that court now entertains a liberal view with respect to the taxing power of states, but the plaintiff calls our attention to *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. 685, 14 L. Ed. 2d 165, 85 S. Ct. 1242 (1965), wherein the court held that the State of Arizona could not impose an excise tax upon a federally-licensed Indian trader based upon the gross proceeds of sales upon the reservation of the Navajo Indians. The plaintiff relies heavily upon this case and contends that it stands for the proposition that Congress has preempted the field of Indian trading, leaving no room for state regulation or imposition of state taxes.

The facts of that case, however, are so different in material aspects from the facts of this case that the law enunciated therein has no application here. There, the company upon which the tax was sought to be imposed had been licensed by the Commissioner of Indian Affairs to trade with the Indians. Here, the plaintiff holds no such license.[4]

---

[3]The opinion recalls the words of Mr. Justice Holmes in *Panhandle Oil Co. v. Mississippi ex rel. Knox,* 277 U.S. 218, 72 L. Ed. 857, 48 S. Ct. 451, 56 A.L.R. 583 (1928), "The power to tax is not the power to destroy while this court sits."

[4]We are advised by counsel for the Washington State Department of Revenue that the Commissioner has never exercised the power given by

Furthermore, admittedly, the bulk of his trade is with non-Indians. Thus, the state tax does not interfere with a federal licensing policy as it did in the Arizona case.

However, we do not rely upon this distinction as the basis for our decision. Rather, the most important distinguishing feature is that the Navajo Indians of Arizona had not submitted themselves to the jurisdiction of the state, and the state had not assumed such jurisdiction. The court said:

> Congress has, since the creation of the Navajo Reservation nearly a century ago, left the Indians on it largely free to run the reservation and its affairs without state control, a policy which has automatically relieved Arizona of all burdens for carrying on those same responsibilities.

380 U.S. at 690.

Observing that Congress had evidenced a purpose of ensuring that no burden should be imposed upon Indian traders for trading with Indians on reservations except as authorized by acts of Congress or by valid regulations promulgated under those acts, the court said that the tax in question would put financial burdens upon the trader or the Indians with whom he traded in addition to those Congress or the tribes had prescribed, and could thereby disturb the statutory plan for insuring that the prices paid by the Indians were fair. The court continued:

> And since federal legislation has left the State with no duties or responsibilities respecting the reservation Indians, we cannot believe that Congress intended to leave to the State the privilege of levying this tax.

(Footnote omitted.) 380 U.S. at 691.

Implicit in this language is a declaration that, had the Congress placed duties upon the state or authorized it to assume duties with respect to the Indians and had the state assumed such duties, a different result would have been indicated.

---

25 U.S.C. § 261 (1876) to license Indian traders in this state, and the plaintiff has not questioned the accuracy of his statement.

Here, the Congress has not only failed to preempt the field of Indian trading but it has authorized the state to assume jurisdiction over such trading; the Colville tribe has requested that the state assume such jurisdiction, and the state has accepted the responsibility. Unlike Arizona, the State of Washington does indeed have duties to perform for the Colville Indians. These Indians now enjoy all the rights and privileges which are enjoyed by citizens generally. They have the protection of all the state's criminal laws and the services of its courts and all of the benefits to which other citizens similarly situated are entitled under its civil laws.

It was the purpose of the Congress in enacting Public Law No. 83-280 to release from federal supervision and protection those Indians who wish to be released, except in the areas expressly reserved in the act, and to subject them instead to the jurisdiction of the states. It was the evident purpose of Congress to facilitate the emergence of the Indian from his inferior status as a protected (but nevertheless disadvantaged) ward of the federal government to the status of full citizen, both of the state in which he resides and of the United States, with all of the privileges and responsibilities of such status.

It is suggested by the plaintiff that the regulating and taxing of his sales of cigarettes by the state interferes with tribal government. There is no showing of any actual conflict between the state laws and tribal laws, but if there were such a conflict, the state law would, under Public Law No. 83-280, be controlling. That act provides that only such tribal customs and ordinances as are not in conflict with state laws are to be preserved.

The plaintiff in this case has entered into the commercial life of the community in which he lives. He sells a product manufactured by others, the sale of which the state has found it desirable and necessary to regulate. The plaintiff does not question the right of the state to impose a tax upon the sale of cigarettes generally. But he contends that he should be exempt from the duty of collecting and remit-

ting that tax and should thus enjoy a competitive advantage over non-Indian sellers of cigarettes. He has cited no authority which supports this proposition.

We are convinced that, when Congress enacted Public Law No. 83-280, authorizing the states to assume jurisdiction over Indian tribes and their members and providing that, after such assumption the civil laws of the state should apply to the Indians on the reservations the same as to others, it intended that the only exceptions to the operation of those laws should be those enumerated in the act. The plaintiff's business activities do not fall among those exceptions.

The judgment is affirmed.

HAMILTON, C.J., FINLEY, HALE, NEILL, SHARP, and WRIGHT, JJ., and RYAN and MIFFLIN, JJ. Pro Tem., concur.

Petition for rehearing denied November 15, 1971.