**CONFEDERATED BANDS AND TRIBES OF the YAKIMA INDIAN NATION, Appellant,**

v.

**STATE OF WASHINGTON et al., Appellees.**

**No. 74–1225.**

United States Court of Appeals, Ninth Circuit.

Jan. 21, 1977.

Rehearing and Rehearing En Banc Denied July 1, 1977.

James B. Hovis (argued), of Hovis, Cockrill & Roy, Yakima, Wash., for appellant.

Malachy R. Murphy, Deputy Atty. Gen. (argued), Olympia, Wash., for appellees.

Before CHAMBERS, BROWNING, DUNIWAY, ELY, HUFSTEDLER,

WRIGHT, TRASK, CHOY, GOODWIN, WALLACE, SNEED and KENNEDY, Circuit Judges.

SNEED, Circuit Judge:

The Yakimas argue before this court en banc that PL–280 did not authorize Washington to assume partial jurisdiction and that Rev.Code Wash. § 37.12.010 is accordingly invalid.

We must first decide whether the Supreme Court's summary dismissals in *Tonasket v. Washington*, 420 U.S. 915, 95 S.Ct. 1108, 43 L.Ed.2d 387 (1975) and *Makah Indian Tribe v. Washington*, 397 U.S. 316, 90 S.Ct. 1115, 25 L.Ed.2d 335 (1970) foreclose the issue. We can dispose of *Tonasket* quickly because the Supreme Court of Washington did not address the partial assumption question (as it did the disclaimer issue) after the United States Supreme Court vacated its prior decision and remanded the case for reconsideration in the light of *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); accordingly, the partial assumption issue was not before the Supreme Court when it dismissed the second appeal. *Makah* is somewhat more troublesome because *Makah* clearly involved a partial assumption of jurisdiction under Rev. Code Wash. § 37.12.010 in connection with highways. We think *Makah* is not dispositive for two reasons. First, the jurisdictional statement to the Supreme Court did not specify the partial assumption issue as a "Question Presented," and partial assumption was mentioned only in passing in the supporting text. Second, the State's motion to dismiss or to affirm was directed to the disclaimer issue. Accordingly, we construe the dismissal order to resolve the disclaimer issue only.

Washington's primary reliance is placed on the following language from *Quinault Tribe of Indians v. Gallagher*, 368 F.2d 648, 655 (9th Cir. 1966) (hereinafter *Quinault II*):

"The third claim which plaintiffs purport to state in their complaint is that chapter 36, Laws of 1963, amending chapter 240, Laws of 1957, is void because it represents only a partial assumption of state jurisdiction over Indian reservations, whereas Public Law 280 does not authorize partial assumption of jurisdiction.

". . . We do not read that act as constituting only a partial assumption of jurisdiction. The state therein indicates its willingness to extend criminal and civil jurisdiction over all Indians and Indian territory, reservations, country and lands within the state, it being provided, however, that as to some matters concerning some Indians, there must first be a tribal resolution and a gubernatorial proclamation. In chapter 240, Laws of 1957, this Indian resolution and governor's proclamation procedure applied to all exertions of state jurisdiction.

"In our opinion, the indicated condition precedent to the exertion of state jurisdiction as to some matters concerning some Indians involves no violation of Public Law 280. If the Quinault Tribe of Indians feels aggrieved because state jurisdiction is not presently being exerted to the full extent possible under chapter 36, all it has to do is provide the governor with a tribal resolution of the kind called for in section 5 of that act (RCW 37.12.-021). A governor's proclamation would necessarily follow, and a full exertion of state jurisdiction would be achieved." 368 F.2d at 657–58.

The ultimate holding of *Quinault II* supports the State's argument, and we choose to affirm it. While *Quinault II*, strictly speaking, avoided the assumption-of-partial-jurisdiction issue by treating Washington's assumption as total, it is reflective of a long-standing opinion that PL–280 authorizes the assumption of partial subject matter, and partial geographic, jurisdiction.[1] Examination of the relevant legislative history does not disprove this interpretation of PL–280 and, in fact, provides some degree of support. More critically,

1. *See infra* p. 447. *See also Tonasket v. Washington*, 79 Wash.2d 607, 488 P.2d 281 (1971); *Makah Indian Tribe v. Washington*, 76 Wash.2d 485, 457 P.2d 590 (1969).

reversal of *Quinault II* at this late stage, along with a new interpretation of PL–280, could lead to unfortunate law enforcement problems for thousands of native Americans.

I

To hold, as the dissent would have us do, that any *partial* assumption of *criminal* jurisdiction by the states is violative of PL–280 would overturn the jurisdictional systems under which live approximately 16,000 Indians in the State of Washington and 5,000 Indians in Idaho. The jurisdictional systems under which 115,000 Indians in Arizona and 22,000 Indians in Montana live would also be jeopardized.[2] The effects of such an immediate jurisdictional upheaval would be far-reaching and quite unpredictable for the approximately 158,000 Indians potentially affected by this decision.

For example, Washington has performed certain services since 1963. Doubts about whether tribal or federal authorities would be ready to step in immediately are quite reasonable. Consider highway traffic law

enforcement and juvenile delinquency, two specific areas where state jurisdiction would be invalidated under the view of the dissenters. Both are complicated fields. Patrol cars and officers are necessary if the highways are to be efficiently patrolled. Skilled personnel, as well as specialized detention facilities, are needed to handle the problems presented by the delinquency of juveniles. It is very doubtful that the tribe or the federal government immediately could provide these resources. Even if the states are providing only minimal services, it is unlikely that tribal or federal authorities could equal or surpass that level in the near future.

Other "option states" within the circuit would confront similar uncertainties and confusion. "Option states" not within the circuit, moreover, could not view such action with indifference. Until the dissent's position was acted upon by their circuit, and possibly ruled upon by the Supreme Court, any partial assumption of jurisdiction, not arranged pursuant to procedures of the 1968 legislation, would be under a cloud.[3]

**2.** *See infra* p. 448. All population statistics as of March 1970 in T. Taylor, The States and Their Indian Citizens, app. B, at 176 (Bureau of Indian Affairs 1972).

**3.** To grasp the magnitude of the problem with which we are confronted, there are nineteen states having Indians residing therein which can be designated as "option states." Of this, eight have disclaimers of Indian jurisdiction in their state constitutions (Arizona, Montana, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, and Washington). S.Rep. No. 699, 83rd Cong., 1st Sess. 6 (1953). Eleven, on the other hand, have no such constitutional disclaimers (Colorado, Florida, Idaho, Iowa, Kansas, Louisiana, Michigan, Mississippi, Nevada, North Carolina, and Wyoming). T. Taylor, *supra* note 2, at 176. The eight are authorized by section 6 of PL–280 "to amend, where necessary, their state constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil or criminal jurisdiction." The eleven, together with such of the eight as have removed their constitutional impediments, under section 7 of PL–280 are permitted "to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

The responses of these nineteen states have not been uniform. Six states assumed some kind of partial jurisdiction (Arizona, Idaho, Iowa, Montana, North Dakota, and Washington). Ten of the remaining states have not assumed any effective jurisdiction (Colorado, Kansas, Louisiana, Michigan, Mississippi, New Mexico, North Dakota, Oklahoma, South Dakota, and Wyoming). Two other states acted after the 1968 amendments to PL–280 and so are covered by a different statutory scheme (Nevada and Utah). One state assumed complete jurisdiction (Florida). Even among the states assuming partial jurisdiction, there have been a variety of approaches. Washington's plan is adequately described in the dissent, *infra* at p. 447. Idaho, in 1963, assumed partial subject matter jurisdiction in both the civil and criminal areas. Nevada originally adopted a county option approach but, following the 1968 legislation by Congress, returned all previously assumed jurisdiction if the tribe refused to consent to its continuation. Montana, in 1963, assumed only criminal jurisdiction over the Flathead Indian Reservation. Arizona, in 1967, despite its constitutional disclaimer clause, assumed jurisdiction only with respect to air and water pollution control.

## II

Despite these consequences we would not hesitate to overrule *Quinault II* if it were plainly and unequivocally inconsistent with the applicable legislative history of PL–280. But it is not. At worst, this history simply does not directly address the partial assumption issue.[4] There are, however, aspects of PL–280 and its legislative history that suggest assumption of partial jurisdiction is valid and that *Quinault II*, as here interpreted, is sound.

First of all, partial geographic jurisdiction was specifically provided by the Act with respect to certain mandatory states, by excluding specific reservations from coverage.[5] There is no reason to suppose that option states were not to have the power to be similarly flexible. Exclusion of an entire reservation is different, of course, from "checker-boarding." There is, however, nothing to indicate that a state given the option to assume jurisdiction was required either to exclude entire reservations or to assume jurisdiction with respect to all Indian country within its territorial limits. Congress, by vesting states with an option, evidenced that at that time it did not know how jurisdiction in such states should be arranged. Experimentation undoubtedly was expected and that is what has occurred.

It is also reasonable to conclude that experimentation with respect to subject matter jurisdiction was intended. This is indicated by the fact that the Department of Interior conferred extensively with the representatives of mandatory states and the Indian tribes before presenting a bill to Congress in 1953.[6] Both the mandatory states and the tribes therein had agreed to an assumption of complete civil and criminal jurisdiction prior to submission. However, very few of the option states and tribes therein were consulted. By failing to consult extensively and by vesting option states with the power to assume jurisdiction, it is reasonable to assume that Congress was prepared to permit various jurisdictional arrangements to be developed at the state level. No restraints on these arrangements were imposed by PL–280.

To assume no such restraints with respect to geography or subject matter were intended is consistent with the assimilative thrust of the 1953 legislation. Congress in PL–280 intended to relinquish federal jurisdiction over Indian people residing on reservations as quickly as possible. Relinquishment in option states simply had not been worked out in 1953.[7] So far as Congress then knew it might never be worked out; but it is clear that Congress had hopes. Nothing could be more reasonable than to assume that Congress anticipated that various jurisdictional arrangements would be developed in option states. And this is what happened. We suggest that Congress anticipated, in a broad sense, this general direction of events that occurred in the option states.

Nor do we believe that the danger of states assuming only the beneficial aspects of jurisdiction while rejecting those more burdensome was so clear and present that Congress in 1953 reasonably could not have considered vesting in option states the power to experiment. Indeed, the failure of Congress in 1953 to repeal earlier grants of partial subject matter jurisdiction clearly suggests the contrary.[8] Of particular im-

---

4. An exhaustive review of the legislative history surrounding PL–280 concludes that "[t]here is nothing in the legislative history surrounding the enactment of PL–280 that definitely indicates whether Congress intended to permit partial jurisdiction by subject matter." Goldberg, *PL–280: The Limits of State Jurisdiction Over Reservation Lands*, 22 U.C.L.A.L.Rev. 535, 554–55 (1975).

5. The Red Lake Reservation in Minnesota, the Warm Springs Reservation in Oregon, and the Menominee Reservation in Wisconsin were all specifically excluded.

6. S.Rep. No. 699, 83rd Cong., 1st Sess. 6–7 (1953)—letter from Mr. Lewis, Assistant Secretary of the Interior to Mr. Miller, Chairman of the House Interior and Insular Affairs Committee.

7. *Id.* at 6.

8. 25 U.S.C. § 231 allows the Secretary of the Interior to promulgate regulations permitting

portance to this case is the fact that Washington's partial assumption of jurisdiction reflects quite burdensome undertakings not likely to be defrayed from revenues derived from Indians.

This fiscal imbalance, undoubtedly present under Washington's scheme, illumines an aspect which strongly suggests recognition by Congress of the necessity to permit experimentation with partial assumptions. This aspect is that the propensity of a state to assume jurisdiction is a function of its fiscal strength and the magnitude of the burden assumption imposes. It follows that the propensity of each state is different. Only by permitting the option states to experiment with assumptions of partial jurisdiction could Congress allow each state to fit its burdens to its capacities.

Another indication that partial assumption is valid appears in the meaning given the statute by the Department of Interior, the department closely involved in drafting PL–280 and having the primary responsibil-

ity for Indian affairs.[9] During hearings in connection with enactment of the 1968 amendments to PL–280, which explicitly permit partial assumptions when the Indians give their consent, an Assistant Secretary of the Interior in a letter to Representative Aspinall observed that the 1968 amendments would make "explicit an authority which we believe is now implicit—an authority to assume partial or piecemeal jurisdiction, either by geographic area or by subject matter." *Hearings on HR 15419 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs*, 90th Cong., 2d Sess., ser. 23, at 25 (1968). Even more directly relevant is that the letter observed approvingly that Washington, Idaho, and Nevada had already assumed partial jurisdiction. This court has previously cited this letter as evidence of the Congressional intent in enacting PL–280. Though the language in *United States v. Burland*, 441 F.2d 1199 (9th Cir.1971), endorsing the Department of the Interior's position is probably dictum, it is another indication of the strength of that position.[10]

state authorities to enter Indian tribal lands, reservations and allotments for the purpose of making inspection of health and educational conditions and enforcing sanitary and quarantine regulations. Though no regulations were ever promulgated under this statute it does show a Congressional intent to allow partial subject matter jurisdiction. An amendment to the statute in 1946 authorized the states "to enforce the penalties of state compulsory school attendance laws against Indian children and parents." 25 U.S.C. § 231(a). This provision evidenced a further intent to allow the states to deal with particular subject matter areas. The failure to repeal these provisions in 1953 suggests a continuing intent on the part of Congress to allow the option states to experiment with partial subject matter jurisdiction.

9. As the agency most closely tied to the drafting and administration of Indian laws, its interpretation of a statute should be given "great weight." *See United States v. Jackson*, 280 U.S. 183, 193, 50 S.Ct. 143, 74 L.Ed. 361 (1930); *Stevens v. Comm'r*, 452 F.2d 741, 746 (9th Cir.1971).

10. Against this expression of the Department of Interior's view is the statement by Representative Aspinall, quoted by the dissent, *infra* at p. 455. This statement asserted that the 1968 amendment permitting the assumption of partial jurisdiction represented a change in the law. Since *Quinault II*, decided in 1966, is not

an unreasonable interpretation of an imprecise statute, Representative Aspinall's statement cannot be accepted as entirely accurate.

Be that as it may, his statement is not supported by the letter of Deputy Attorney General Warren Christopher cited by the dissent, *infra* at p. 455, n.20. This letter expressed doubt about the wisdom of recognition by the 1968 amendments of assumptions of partial criminal jurisdiction. Its relevant portion merely observed that the Department of Justice "has in the past emphasized the desirability from a law enforcement point of view of not adding to the complexity of the existing jurisdictional structure. For this reason, states and consenting tribes should be encouraged to shift jurisdictional responsibility en bloc whenever possible." *Hearings on H.R. 15419, supra* at 28.

The best that the dissent properly can make of these bits of history is that Representative Aspinall thought the 1968 legislation changed PL–280 despite the contrary authority of *Quinault II* and that perhaps there was a difference between Justice and Interior with respect to the policy of partial assumptions of criminal jurisdiction. Deputy Attorney General Christopher's letter cannot be construed as an official interpretation by the Department of Justice of the legality of partial assumptions of criminal jurisdiction under the 1953 legislation.

In summary, the applicable legislative history of PL–280 provides reasonable support for *Quinault II*. We see no reason to overturn a reasonable interpretation of an ambiguous statute understood for a generation to be the law when the consequences of so doing are so uncertain and far-reaching.

## III

We recognize that Washington's checkerboarding of criminal jurisdiction might appear particularly inefficient and that its elimination may be desirable. However, it would be difficult to limit an opinion overruling *Quinault II* merely to such a scheme. An overruling of *Quinault II* inevitably would cast grave doubt on Montana's 1963 assumption of criminal jurisdiction over only the Flathead Indian Reservation.[11] There is nothing in the relevant legislative history to indicate that it was the intent of Congress to proscribe assumptions of jurisdiction geographically partial *within* reservations but to approve assumptions of jurisdiction geographically partial *between* reservations.

Nor would it be easy to limit such a holding to the proscription merely of partial assumptions of *criminal* jurisdiction. To validate assumptions of partial civil jurisdiction in the face of such a holding would sink to the level of clumsy and heavyhanded legislation by adjudication. Moreover, there exists nothing in the legislative history to suggest that partial assumption in the civil area is proper while improper in the criminal area. In addition, the administration of such a distinction would prove to be quite complex. The distinction between civil and criminal jurisdiction is not easy to draw.[12] Thus, assumptions of partial civil jurisdiction would be challenged and, after time and expense, very likely would fall.[13] With this result would arise retroactivity problems more complex than we can now imagine.

Finally, a general and all encompassing proscription of assumptions with respect to *portions* of the Indian country within a state would invalidate state statutory schemes in which such assumptions are conditioned upon consent of the Indians. As already indicated, Washington, Idaho, and Montana have such legislation. To invalidate only those partial assumptions where consent has not been given would be either to apply improperly the 1968 amendments retroactively or to engraft on PL–280 a requirement of consent which all concede was not intended by Congress. Invalidation where consent has been given, however, borders on perversity when it is recalled that the 1968 amendments permit such assumptions. Finally, to invalidate *all* geographically partial assumptions for the sole purpose of requiring renegotiation of

---

11. Mont.Rev.Code Ann. § 83–801 (1966).

12. In determining what aspects of the Bill of Rights apply to a particular judicial proceeding, the courts have often been plagued by the question of whether the underlying statute is "criminal" or "civil." *See, e.g.,* Note, *The Quasi-Criminal Ordinance Prosecution in Illinois,* 68 Nw.U.L.Rev. 566 (1973). Such determinations are not always simple. An example of the difficulties that could arise if we were to hold only partial assumptions of *criminal* jurisdiction invalid is provided by Arizona's assumption of jurisdiction within Indian territory over air and water pollution control. *See* Ariz. Rev.Stat.Ann. §§ 36–1801, 36–1865 (1974). While this jurisdiction at first glance might be assumed to be civil in nature, Arizona provides that violators of the air and water standards will be guilty of misdemeanors and, in some cases, subject to a penalty of from $50 to $1,000 per day. Ariz.Rev.Stat.Ann. §§ 36.789.-01, 36–1720, 36–1864 (1974). Does this make the jurisdiction, at least in part, criminal in nature? Should this turn on whether Arizona describes its fine as a "criminal penalty" or a "civil fine"?

Rev.Code Wash. § 37.12.010 extends state jurisdiction over "compulsory school attendance; public assistance; domestic relations; mental illness; juvenile delinquency; adoption proceedings; dependent children; and operation of motor vehicles upon the public streets, alleys, roads and highways." Which of these categories, if any, are wholly civil or wholly criminal, and how to divide up the categories that are part civil, part criminal, are questions not easily answered.

13. This would invalidate Arizona's assumption of jurisdiction over air and water pollution control should that assumption be regarded as civil. *See* Ariz.Rev.Stat.Ann. §§ 36–1801, 36–1865 (1974). *See* note 12 *supra.*

the state-tribe relationship under the 1968 amendments would involve us in an undertaking essentially legislative in character. We decline to undertake a function so incompatible with traditional restraints on judicial action.

The power of the United States, acting executively or congressionally, to rescue any and all Indians from the states imposing their jurisdiction improperly cannot be doubted. These branches of our Government are not insensitive to Indians.[14] Our intervention in this case would be both redundant and unwise.

We adhere to *Quinault II* and the dictum of *United States v. Burland,* 441 F.2d 1199 (9th Cir.1971) and remand this case to the panel before which it initially was heard to consider the other issues involved in this case.

REMANDED.

HUFSTEDLER, Circuit Judge, dissenting, with whom Circuit Judges BROWNING, DUNIWAY, ELY and WALLACE concur.

The Confederated Bands and Tribes of the Yakima Indian Nation ("Yakimas"), invoking federal jurisdiction under 28 U.S.C. § 1362, brought this suit challenging the statutory and constitutional validity of the State of Washington's assumption of criminal and civil jurisdiction over the Yakimas' reservation lands and sought a declaration that the assumption was void, or if not void, that the assumption gave the State concurrent rather than exclusive jurisdiction. The district court rejected their contentions on a number of grounds, and the Yakimas appeal from the adverse judgment.

On appeal the Yakimas contend: The State's assumption of jurisdiction is invalid because the State did not comply with a statutory condition precedent to assumption imposed by Congress in PL–280[1] because the State did not amend her constitutional disclaimer of jurisdiction over the Yakimas, and she did not obtain tribal consent to her assumption of jurisdiction. If the State could have assumed complete jurisdiction over the Yakimas, R.C.W. § 37.12.010, the assumption of partial jurisdiction is invalid because it is unauthorized by PL–280. Even if PL–280 purported to authorize partial assumption, R.C.W. § 37.12.010 is unconstitutional as applied to the Yakimas.

The court *sua sponte* ordered this case *en banc* for the purpose of deciding whether to overrule that part of *Quinault Tribe of Indians v. Gallagher* (9th Cir.1966) 368 F.2d 648 ("*Quinault II*"), stating that PL–280 authorized Washington's partial assumption of jurisdiction over Indian reservations. The majority of the court refuses to overrule this part of *Quinault II* and holds that PL–280, authorized the multiple partial assumptions at issue. In my view, the reasoning and the result of *Quinault II* are wrong and should be overturned. The majority's decision to the contrary is based on a misreading of the statutory scheme, a misinterpretation of the legislative history, and some strongly worded, but factually unsupported fears about the impact of correcting our past mistakes in *Quinault II.* The end product is the perpetuation of some bad law, and the enforced and otherwise unnecessary confrontation with some difficult constitutional issues.[2]

The *Quinault II* issue that we took *en banc* was wrongly decided. *Quinault II* de-

---

14. In a meeting with Indian leaders on July 16, 1976, President Ford committed himself "to furthering the self-determination of Indian communities . . . without terminating the special relationship between the Federal Government and the Indian people." He also supported the concept "of allowing Indian tribes to determine whether they and their members in addition to being under tribal jurisdiction should be under State or Federal civil and criminal jurisdiction." The Departments of Justice and Interior are currently drafting legislation which would accomplish these goals. 12 Weekly Compilation of Presidential Documents, No. 30, at 1171–1172 (July 26, 1976).

1. Act of Aug. 15, 1953, ch. 505, 67 Stat. 588–90; "PL–280."

2. The constitutional issues must be resolved by the original panel following remand by the court *en banc.*

cided that R.C.W. § 37.12.010 was not a partial assumption of jurisdiction because the Indians could always resolve to consent to full jurisdiction, and if the tribe did so, the Governor had to issue the statutory proclamation, which would result in jurisdiction to the full limits of Congress' consent. R.C.W. § 37.12.010, however, is a partial assumption statute and it cannot become something else because the tribe could avoid its provisions altogether by following a different statute. But, of greater moment, a potential for consent to complete state jurisdiction is no answer to the key questions whether Congress permitted any partial assumption by a disclaimer state, like Washington, or whether Congress ever gave Washington the power to limit the Indians' choices to complete jurisdiction that they did not want or partial jurisdiction that they did not want either.

*Quinault II* failed to recognize that Washington's assumption scheme involves multiple partial assumptions: (1) assumption of jurisdiction of less than all Indians, tribes, and reservations; (2) partial territorial assumption within reservations; and (3) partial assumption of subject matter jurisdiction within reservations.

I have no difficulty in upholding the validity of reservation-by-reservation or tribe-by-tribe assumptions under PL–280, and to the extent that the majority opinion rests on that conclusion, I agree with it.[3] That issue was never addressed in *Quinault II.* However, the second and third types of partial assumption are not valid under PL–280.

### I

I start with a brief statutory sketch of Washington's assumption schemes. In 1957, the legislature enacted chapter 240, Laws of 1957 (R.C.W. § 37.12) which allowed the Indians to request the governor to assume jurisdiction, with exceptions here not pertinent, whereupon the governor was to issue a proclamation confirming the assumption. In 1963, Washington amended her assumption statute dividing jurisdiction into two broad categories: (1) jurisdiction assumed with the consent of the affected tribes; (2) jurisdiction assumed without tribal consent. In the first category, upon tribal resolution and gubernatorial proclamation, the State would assume jurisdiction over "all Indians and all Indian territory, reservations, country, and lands of the Indian body involved to the same extent that this state exercises civil and criminal jurisdiction or both elsewhere within the state." (R.C.W. § 37.12.020, *recodified* as R.C.W. § 37.12.021, Wash.Laws 1963, ch. 36) As to nonconsenting tribes, Washington assumed jurisdiction to the fullest extent permissible under PL–280 in respect of fee land, but she assumed jurisdiction as to non-fee lands ("tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States") only in respect of eight categories of subject matter (compulsory school attendance, public assistance, domestic relations, mental illness, juvenile delinquency, adoption proceedings, dependent children, and operation of motor vehicles upon the public streets, alleys, roads, and highways). (R.C.W. § 37.12.010.) These statutes are partial in that they authorize assumptions reservation by reservation. As to nonconsenting tribes, Washington divided fee from non-fee lands and assumed less than all subject matter jurisdiction on non-fee lands.

The majority opinion decides that Congress authorized Washington to assume

---

**3.** The exception of well-governed reservations from total assumption of jurisdiction in mandatory states is entirely consistent with the overriding concern of Congress to cure the breakdown in criminal law enforcement on the reservations. (The excepted reservations were Red Lake Reservation in Minnesota, Warm Springs Reservation in Oregon, and Menominee Reservation in Wisconsin.) Congress' attention was focused for this purpose reservation by reservation, rather than state by state. The genesis of PL–280 was in individual state by state bills, which at first did not include any exceptions. *See* Hearings on H.R. 459, H.R. 3235, and H.R. 3624 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs on State Legal Jurisdiction in Indian Country, 82d Cong., 2d Sess., ser. 11 (1952).

partial geographic jurisdiction and partial subject matter jurisdiction within a single reservation. As the majority acknowledges, PL–280 does not say so; indeed, Congress did not plainly speak its mind one way or the other. We must seek congressional intent from the hints of PL–280 and its later amendments and from such congressional policies as can be identified from the legislative history.

I realize that defining congressional policy is not an easy task because Congress has never formulated a coherent policy toward Indians. It has wavered between and among federal dependence, assimilation, and autonomy. In pursuit of one policy, rather than another, and sometimes adopting antithetical policies at the same time, Congress has kept, given, and shared jurisdiction with the states over Indian affairs. The end product has been and still is confusion. However, no confusion exists on the point that history supplies no support for the majority's conclusion that Congress intended the states to experiment with partial jurisdiction. The failure of the Department of Interior to consult with option states or with nonconsenting Indians had nothing to do with some kind of experimental proclivities in departmental or congressional minds. On the contrary, it was further evidence of departmental and congressional insensitivity toward Indians. As far as the legislative history reveals, assimilation as a means to "resolve" Indian problems was relatively strong in 1953 when PL–280 was enacted. But of greater moment were the pressures and counterpressures from states who wanted the benefits of total jurisdiction, from those states who were unwilling or unable to assume the

burdens that assumption would entail, from those members of Congress who wanted to halt the drain on federal financial resources caused by retaining federal jurisdiction, and from others who recognized that federal thrift was not an acceptable excuse for abandoning the federal government's fiduciary and quasi-fiduciary obligations to Indians. PL–280 was a compromise among the powerful contending state-federal forces, in which concern for the Indians, even experimentally, was not evident. In addition to the interest in money spent or saved, the primary motivation for PL–280 was the enforcement of criminal law on the reservations. The strongest single thread in the legislative history was the intent to cure "[t]he complete breakdown of law and order on many of the Indian reservations," as Wesley D'Ewart, House Indian Affairs Subcommittee member, described the situation.[4]

Six states (Alaska, California, Minnesota, Nebraska, Oregon, and Wisconsin), known as the "mandatory" states, were willing to assume complete civil and criminal jurisdiction, and none of them had internal impediments to assumption. PL–280 gave consent to transfer immediately full jurisdiction to those states, with a few stated exceptions for specifically designated well-governed reservations.[5] The remaining states, known as "option states," were given the limited choice "as provided in the Act" to assume jurisdiction of "criminal offenses or civil causes, or with respect to both."[6]

The majority opinion's conclusion that Congress authorized the option states to assume patchwork jurisdiction within a single reservation is flatly contrary to its clearly evinced intent to cure the break-

---

4. *Id.* at 16.

5. Other exceptions, not pertinent here, related to trust lands and some federal treaty, contractual and statutory obligations. *PL–280 § 2(b).*

6. The option states divide into two groups, those states with constitutional disclaimers of jurisdiction over Indians, and all other states. Section 6 of PL–280 permits disclaimer states to amend their constitutions to allow jurisdiction. Section 6 has been read as an alternative

to section 7 which originally applied to "any other States." I interpret section 7 as applying to all states other than the mandatory states; *i.e.,* it is the general provision allowing assumption, and section 6 applies only if it is necessary to remove state constitutional impediments. The 1968 amendments, wherein section 6 was left intact as 25 U.S.C. § 1324 while section 7—now 25 U.S.C. §§ 1321, 1322—was changed to read "any State," reinforces this view.

down of criminal law enforcement on reservations that were not internally well governed. The most striking departure from congressional intent is the majority's conclusion that PL–280 authorized Washington's partial geographic assumption within a reservation, commonly known as "checkerboarding." The Supreme Court has noted the deleterious effects of checkerboarding upon law enforcement in an analogous situation:

"... [W]here ... the existence or nonexistence of federal jurisdiction, depends upon the ownership of particular parcels of land, law enforcement officers operating in the area will find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense, even though committed within the reservation, is in the State or Federal Government. Such an impractical pattern or checkerboard jurisdiction was avoided by the plain language of § 1151 and we see no justification for adopting an unwarranted construction of that language where the result would be merely to recreate confusion Congress specifically sought to avoid." (*Seymour v. Superintendent* (1962) 368 U.S. 351, 358, 82 S.Ct. 424, 428, 7 L.Ed.2d 346.)

In striking down South Dakota's 1961 statute assuming jurisdiction over highways on the reservations, the South Dakota Supreme Court cited the law enforcement quagmire created by partial geographic jurisdiction as one of the reasons why such partial assumption was inconsistent with the policy of PL–280. (*In re Hankin's Petition* (S.D.Sup.Ct.1964) 125 N.W.2d 839).[7]

Congress did not need to run experiments to decide that checkerboarding was antithetical to effective law enforcement. Moreover, when it wanted to permit some partial assumption in circumstances that did not affect criminal law enforcement, it left no doubt about its intentions. Section 2(a) of PL–280, *as amended* by Act of Aug. 8, 1958, Pub.L. No. 85–615, § 2, 72 Stat. 545, 18 U.S.C. § 1162(a), exempted three named reservations. Section 2(b) provided a very narrow exception to free Indian trust property from "alienation, encumbrance, or taxation."[8] The mandatory states were to take jurisdiction in "[a]ll Indian country within the State," other than specified reservations; there is nothing to indicate the optional states were to take less. On the other hand, the 1968 amendments permit states to assume jurisdiction in the "particular Indian country or part thereof" to which the Indians consent. If Congress wished to accomplish a similar goal under PL–280, it would not have been so coy about it.

The Yakimas' reservation is a checkerboard of fee owned and non-fee owned land. The effect of Washington's partial territorial assumption is to combine on the

---

**7.** "It seems to us that this legislation does not tend to accomplish or promote the congressional purposes of Public Law 280. To the contrary, it would proliferate the law enforcement authorities in Indian country by adding the state as another entity with geographically limited jurisdiction where the Federal and Tribal courts already operate, each with limited subject matter jurisdiction. Moreover, it makes inescapable the checkerboard jurisdiction condemned in *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 ...." (*In re Hankin's Petition* (S.D.Sup.Ct.1964) 125 N.W.2d 839, 842–43.)

**8.** 18 U.S.C. § 1162:

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof."

same reservation a Washington law enforcement pattern that varies from plot to plot depending upon the state of title to the particular parcel of land. One of the major grievances of the Yakimas is that they have seriously inadequate police protection. The Yakima Reservation occupies 46.4 percent of the land encompassed by Yakima County. Reservation Yakimas constitute almost half of the rural population of the County; 80 percent of the Yakimas live in the rural lower valley of the County. No sheriff's office exists on the reservation. Of the 29 deputy sheriffs assigned to work in the field for the County, only 2 were assigned to the reservation. The Yakima County Sheriff said that the state cannot do a good job with juveniles when it has no jurisdiction over parents and that fragmented jurisdiction hampered police work in other law enforcement areas as well.

The Yakimas have requested retrocession of state jurisdiction to enable them to return fully to federal jurisdiction with the hope of federal assistance in securing outside help and in aiding them to work out their problems within the tribal structure.

The State of Washington either does not have, or declines to use resources to improve the situation, but has so far been unwilling or unable to relinquish jurisdiction. This lawsuit is a by-product of the stalemate.

The Yakimas have no effective law enforcement on their reservation.[9] Washington acknowledges that reality.[10] So does the majority of this court. The majority justifies its conclusion that the Yakimas must be made to bear those ills they have because this court refuses to fly to others that we know not of. "More critically," it says, "reversal of *Quinault II* at this late stage [10 years], along with a new interpretation of PL–280, could lead to unfortunate law enforcement problems for thousands of native Americans."[11] The majority opinion's statement that reversal of *Quinault II* would adversely affect 158,000 Indians is factually incorrect. In the first place, *Quinault II* itself has adversely affected the Yakimas, and overturning the decision will alleviate their distress. In the second, invalidating Washington's truly unique checkerboarding would affect no more than about

9. A default in state enforcement has created a situation that the tribal police are powerless to control because they lack jurisdiction.

"Tribal police officers were outspoken about the quality of law enforcement. Their greatest complaints concerned juvenile problems. One officer reported, 'The juvenile situation is sad. There is one juvenile officer who covers three or four counties. He seldom comes to the reservation and when he does he just scolds the kids and lets them off. The kids laugh in his face and then they laugh in my face because they know we cannot do a thing with them. . . .' Others made the same complaint and lamented that there was no action taken by the local authorities on juvenile problems. 'Sheriff's Officers release kids without holding them or doing anything. When we call them they come too late if they even bother to show up. We are getting a real hard time from kids who know we have no jurisdiction over them. Half of the time we don't let on that we have no authority over them because they would run wild.'

"Other officers reported, 'State and County authorities do not enforce the laws. The problem has become worse since the state

took over. The kids know we have no authority and make it hard for us. State officials will not even go onto deeded property where Indian families live, even though they have authority to do so. The tribal police have to go there when the situation seems desperate . . ..' " ("The Impact of Public Law 280 upon the Administration of Criminal Justice on Indian Reservations," in 1 National American Indian Court Judges Ass'n., Justice and the American Indian 9 (1974) (survey of Washington Indians) [Hereinafter cited as "Indian Court Judges Survey"].)

10. "Although the State assumed jurisdiction over major crimes and juvenile delinquency on reservations, counties have not been provided with resources to effectively assume the responsibilities of patrol, apprehension and investigation of offenses committed on reservations . . .." (*Id.* at 7, *quoting* State of Washington, Comprehensive Plan for Law Enforcement and the Administration of Justice, January 1—December 31, 1973, at 109.)

11. Majority opinion, *supra*, at p. 445.

10,000 reservation Indians in Washington.[12] The remaining Washington Indians would be unaffected because they live on reservations where all the land is held in tribal trust,[13] have consented to full jurisdiction under the 1963 statute,[14] have consented to full jurisdiction under the 1957 statute,[15] or are covered by federal jurisdiction after a retrocession.[16] Almost two-thirds of the affected Indians reside on the Yakima reservation and are the parties in interest in this suit.

Invalidating the Washington assumption statute under PL–280 for impermissible geographical checkerboarding would break the stalemate. Washington would be relieved of a law enforcement burden she is unwilling or unable to carry. The Yakimas would be free to negotiate with the federal government and with the State of Washington under PL–90–284.[17] In the interim, the Yakimas' own tribal officers would have authority to deal with offenses and offenders whom they now can do no more than passively observe. This interpretation would not jeopardize jurisdiction that Washington assumed under its 1957 statute, nor is there any reason to believe that jurisdiction thereafter assumed by agreement pursuant to the 1963 law would be adversely affected by invalidation under PL–280.

## II

The majority opinion also errs in upholding the Washington statute against attack based upon partial subject matter assumption. Because I would strike the statute down for impermissible partial territorial assumption, I would not need to reach the partial subject matter issue. I reach the question only because the majority does so.

Congress required the mandatory states to assume complete subject matter jurisdiction. It had very little reason to require less of the option states, when and if they accepted the invitation to assume jurisdiction. But Congress had a very good reason for not permitting any state to choose the subject matter jurisdiction that it would assume. Congress knew that the states wanted the sweet but not the bitter jurisdiction over Indians.[18] Authorization to

12.

TABLE I
Washington Indian Reservations

| | |
|---|---|
| Total Population | 19,362 |
| Number subject to partial geographic and partial subject matter jurisdiction under '63 act (checkerboarding) | 9,697 |
| Number subject only to partial subject matter jurisdiction under '63 act | 985 |
| Number consenting to full jurisdiction under '63 act | 5,758 |
| Number consentng to full jurisdiction under '57 act | 2,647 |
| [495 subject to criminal jurisdiction only] Number over which jurisdiction retroceded in accordance with PL 90-284 | 275 |

Source: Indian Court Judges Survey, *supra* note 9, at App.C.
The reservations subject to checkerboard jurisdiction include Hoh (60), Kalispel (167), Lower Elwha (250), Lummi (1,225), Nooksack (370), Puyallup (450), Quinault (1,200), and Yakima (5,975) reservations.

13. This group includes the Makah (805), Port Gamble (165), and Shoalwater (15) reservations. *Id.*

14. This group includes the Colville (5,350) and Muckelshoot (408) reservations. *Id.*

15. This group is composed of the Chehalis (116), Nisqually (85), Quileute (450), Skokomish (386), Squaxin (165), Swinomish (495) (criminal jurisdiction only), and Tulalip (950) reservations. *Id.*

16. Port Madison reservation.

17. 25 U.S.C. §§ 1321–23.

This result would also be more consistent with the present federal policy of Indian self-determination. See Comment, "The Indian Battle for Self-Determination," 58 Calif.L. Rev. 445, 461–63 (1970). It is an example of wooden legalism to misinterpret PL–280 so as to conflict with present policy. Fortunately, it has long been the usual experience that "[t]he federal judiciary . . . has attempted to mitigate the impact of fluctuating congressional policies." *Id.* at 446.

18. *See* Goldberg, "Public Law 280: The Limits of State Jurisdiction Over Reservation Indians," 22 U.C.L.A.L.Rev. 535, 555 (1975).

This article has meticulously collected and analyzed the legislative history of PL–280. The majority, *supra,* at note 4, cites this article for the proposition that the legislative history does not definitely indicate whether partial subject matter jurisdiction was within the intent of PL–280. However, the majority then goes on to ignore the subsequent analysis in the article which concluded that such jurisdiction is invalid.

states to make their own selections of jurisdiction could lead to the very result that Congress wanted to avoid, that is, letting the states pick only that subject matter jurisdiction from which they could derive benefit and leaving all the onerous matters to the Federal Government. Furthermore, a driving force for passing PL–280 was bringing adequate criminal law enforcement to reservations. Congress knew that in absence of full assumption by a single government, criminal law was a jungle of conflicting jurisdictional problems and fragmented administration that defied effective enforcement.[19]

It is unnecessary, however, to decide whether, before 1968, Congress gave any leeway to option states to assume jurisdiction selectively. It would be enough to decide a much narrower question: Did Congress authorize Washington to assume some but not all of the jurisdiction relating to

criminal offenses, adult and juvenile? The simple answer to that question is "no."

Although there is arguable textual support in section 7 for dividing civil and criminal subject matter jurisdiction ("criminal offenses or civil causes of action, or with respect to both"), the same language and that of section 6 ("civil and criminal jurisdiction") supplies strong textual support for the inference that Congress had no intention of permitting a state to assume pieces of the whole criminal or civil packages.

The 1968 amendments, in contrast, unmistakably permit piecemeal assumption of · jurisdiction. (*See, e.g.,* 25 U.S.C. § 1321(a): "jurisdiction over any or all [criminal] offenses . . ..") Representative Aspinall on the floor of the House stated that this aspect of the 1968 bill was a change in the law. (114 Cong.Rec. 9615 (1968).) Although this statement is not weighty by itself, it is an additional indication that this reading of PL–280 is correct.[20]

19. It still is. E.g., 18 U.S.C. §§ 1152, 1153, 1162(c); 25 U.S.C. § 1321. *See also, United States v. Cleveland* (9th Cir.1974) 503 F.2d 1067; *In re Carmen's Petition* (N.D.Cal.1958) 165 F.Supp. 942, *aff'd sub nom. Dickson v. Carmen* (9th Cir.1959) 270 F.2d 809; Davis, "Criminal Jurisdiction over Indian Country in Arizona," 1 Ariz.L.Rev. 62 (1959); Goldberg, *supra* note 18, at 541.

20. *See also,* Statement of Arthur Lazarus, Jr. (an attorney representing six tribes) in Hearing on H.R. 15419 and Related Bills Before the Subcomm. on Indian Affairs of the House Comm. on Interior & Insular Affairs, 90th Cong., 2d Sess., 116 (1968) ("One of the major objections to Public Law 280 is its 'all or nothing' approach, requiring States to assume all jurisdiction on Indian reservations if any jurisdiction is desired."); Letter from Warren Christopher, Dep. Att'y Gen., to Rep. Wayne N. Aspinall, Mar. 29, 1968, *id.* at 28. *But see,* Letter from Harry R. Anderson, Ass't Sec. of the Interior, to Rep. Wayne N. Aspinall, *id.* at 25.

Evaluating legislative history to determine congressional intent can sometimes be an exercise in nuance. Although the Court has indicated what material is relevant to the determination, little guidance concerning weighting has been attempted. *E.g., Galvan v. Press* (1954) 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (memorandum inserted in Congressional Record by sponsor); *Schwegmann Bros. v. Calvert Corp.* (1951) 341 U.S. 384, 394–95, 71 S.Ct. 745, 95 L.Ed. 1035 (statement by sponsor during presentation on floor of Senate for vote);

*United States v. C.I.O.* (1948) 335 U.S. 106, 113–21 (congressional discussion); *Helvering v. Griffiths* (1943) 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843 (legal opinions relied on by committee and sponsors); *Harrison v. Northern Trust Co.* (1943) 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407 (reports of congressional committees). Here the inquiry is even more obscured because we must look to the history of subsequent legislation to divine the intent of the earlier enactment. *Mattz v. Arnett* (1973) 412 U.S. 481, 505 n.25, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 ("Although subsequent legislation usually is not entitled to much weight in construing earlier statutes, . . . it is not always without significance. See *Seymour v. Superintendent*, 368 U.S., at 356–57, 82 S.Ct. 424.").

Nevertheless, the intent of the 1968 amendments is relevant and reasonably certain enough to add support to the view that partial subject matter jurisdiction is inconsistent with the intent of PL–280. Representative Aspinall was Chairman of the House Interior and Insular Affairs Committee which reported out the bill. His remarks were the only representation as to what the bill was intended to accomplish. The sponsors (Reps. Cunningham & Denney and Sen. Ervin) made no remarks. When weighed against a conflicting view expressed in the opinion of the Assistant Secretary of the Interior, an opinion contradicted by counsel representing some tribes and implicitly contradicted by the Deputy Attorney General, the pronouncement on the floor of the House should control. *Cf. Schwegmann Bros. v. Cal-*

Invalidation on this ground would also have an impact short of the majority's fears. The only states, in addition to Washington, asserting partial subject matter jurisdiction are Arizona, Idaho, and New Mexico.[21] Arizona has extended jurisdiction only over air and water pollution matters.[22] Frustration of this assumption will cause minimal law enforcement or civil problems for either Arizona or Indians on reservations in that state.

Idaho's assumption is similar to Washington's in the subjects covered, but contains one crucial difference.[23] The Idaho jurisdiction is shared with tribal courts as it is concurrent with them.[24] It is unclear that invalidation would have any adverse impact because tribal court structures are performing the task now. Finally, the legality of New Mexico's assumption will remain unaffected as it has attempted to assert jurisdiction on statutory bases other than PL–280.[25] Invalidation does not prevent the states and tribes from negotiating a structure which will operate to the benefit of both. Although I do not know whether Indians in Idaho are experiencing similar problems to those of the Yakimas, invalidation of partial subject matter assumptions would not throw the administration of justice to reservation residents into chaos.

The majority opinion rests on unsound law, and on fears, not facts. The result is a perpetuation of ills forced upon the Yakimas that benefits no one.

I would reverse, invalidating the Washington statute, and set the Yakimas and Washington free from statutory bonds that chafe them both.

vert Corp., supra, 341 U.S. at 394–95, 71 S.Ct. 745 (expression of fear in minority report of Senate Committee not authoritative guide to construction of legislation).

**21.** Indian Court Judges Survey, *supra* note 9, at 25–26.

